Sixth Division
February 22, 2008

No. 1-06-0271

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 02 CR 14656 |
| | ) | |
| JOSE LUIS GONZALEZ, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | John J. Scotillo, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Following a jury trial, defendant, Jose Luis Gonzalez, was found guilty of first degree murder and sentenced to a term of natural life in prison. On appeal, defendant contends that the trial court erred by admitting other crimes evidence and by admitting hearsay testimony. For the reasons that follow, we affirm.

In May 2002, defendant was arrested in Texas and subsequently charged with, among other things, the 1991 murder of his 18-year-old maternal half sister, Angelita Molina. Prior to trial, the State filed a motion to admit other crimes evidence regarding the 1996 murder of defendant's mother, Blanca Molina. The trial court ruled that evidence pertaining to Blanca's murder could not be admitted as other crimes evidence, but that the State could question its police witnesses about the course of their investigation.

The following evidence was presented at defendant's trial.

Tina Marie Shealy testified that she last spoke with Angelita over the telephone on January 19, 2001. She discovered that Angelita was missing the following day and reported her missing to the Elgin police on January 22, 1991. Approximately one week later, defendant called Shealy

and asked if she would take Blanca out to look for Angelita. Shealy never saw defendant join the search for Angelita. She last saw defendant on January 23, 1991, when defendant told her that he had been receiving threatening phone calls.

Alberto Pozos, Angelita's friend, testified that Angelita lived in an apartment with her cousin Tony, Blanca, and defendant. Pozos went to Angelita's apartment around 2 a.m. on January 20, 1991. Tony and a friend were at the apartment at that time, and Blanca arrived at the apartment at approximately 4 a.m. Pozos heard Blanca and Angelita talking when he went to sleep around 4 a.m., and when he awoke the following morning Pozos did not see Angelita and it did not appear that her bed had been slept in. At that time, defendant was downstairs in the living room. A couple of days later, Pozos went to look for Angelita with Tony, although he never went searching for her with defendant.

Robert Bjorkland, a retired detective of the Elgin police department, testified that at approximately 4 p.m. on February 8, 1991, he received a dispatch that a body had been found near Ash and Burch Streets in Elgin, Illinois. The naked and frozen body, later identified as Angelita, was located in a field approximately 200 feet behind her residence. The body had a laceration on the forehead and bruising on the limbs.

Angel Tinajero, who identified Angelita's body for the police, testified that he had previously dated Angelita and that she had given birth to their child.

Dr. Larry Blum performed an autopsy and used a sexual assault kit on Angelita's body. Dr. Blum collected loose hairs from various parts of Angelita's body, took samples of Angelita's blood and head and pubic hair, and took oral, vaginal and rectal swabs.

2

1-06-0271

Dr. Blum testified that in his expert opinion, Angelita died of acute craniocerebral injury due to multiple blunt trauma resulting from a beating and that the manner of death was homicide. Dr. Blum's examination revealed that Angelita had multiple types of blunt force injury, including contusions and abrasions to her face and neck, lacerations to the scalp and head area, and a depressed skull fracture on the right side of the head beneath the temple. Angelita's body also had bruising on the fingers, collarbone, elbow, hip, and knee. There were defensive wounds to the back of Angelita's hands, which Dr. Blum explained could be caused by trying to cover up while being struck on the head. There was a depressed skull fracture beneath a laceration to Angelita's right temple, and bone fragments from the skull fracture had pierced and entered her brain. Dr. Blum opined that the condition of Angelita's body was consistent with her having died between January 20 and January 22, 1991. Dr. Blum testified that Angelita's bruises were inflicted shortly before death and that she died in a prone or fetal position. Dr. Blum opined that the skull fracture was caused by "a horrific amount of force" that was consistent with being hit by a heavy, dense object, such as a hammer or a tire iron. Dr. Blum also examined the tissue around the anus and vaginal areas and did not see any evidence of blunt trauma or bruising to those areas. Dr. Blum explained that this was consistent with a women who had previously given birth and who had possibly been sexually assaulted. Dr. Blum also testified that his findings were consistent with Angelita having been grabbed around the neck or struck during a sexual assault and with Angelita having been sexually assaulted and killed at approximately the same time.

On cross-examination, Dr. Blum testified that his examination of Angelita's body revealed no physical evidence of sexual assault. He also acknowledged that his findings were not

3

inconsistent with Angelita engaging in consensual intercourse prior to having been murdered.

The parties stipulated that defendant was arrested at his home in Elgin on January 23, 1991, on an unrelated matter, and that he was still in custody when Angelita's body was found on February 8, 1991.

Cynthia Torrisi-Barrerra, a forensic scientist in the biology DNA section of the Illinois State Police, testified that on February 13, 1991, she received evidence in this case including hairs and fibers from Angelita's body, a sheet in which police had wrapped the body, and a sexual assault kit. On April 2, 1991, she conducted an analysis of the sexual assault kit, which revealed the presence of sperm on Angelita's vaginal and rectal swabs. Torrisi also determined that several of the human hairs recovered from Angelita were color-treated or dyed, and her further examination of two head hairs from Angelita's known standard revealed that she did not have dyed or color-treated hair.

On cross-examination, Torissi acknowledged that under Macard's Principle, hair transfers between people and objects are common and expected among people who live together or share the same bed.

Roberto Garza, Jr., a Texas Ranger stationed in Corpus Christie, Texas, testified that on January 17, 1996, he was assigned to investigate the murder of Blanca Molina. Blanca was found in a semi-bushy wooded area in a shallow grave approximately 60 yards from her apartment complex. She was naked from the waist down, wrapped neatly in a blanket and a bed sheet that matched the bedding in her apartment. There were no signs of forced entry into her apartment. The medical examiner ruled that the cause of death was strangulation and that Blanca was

suffocated with a plastic bag that was placed over her head. Based upon his initial investigation, Ranger Garza contacted the Elgin police department. In February 1996, the Elgin police sent two detectives to Texas, and Ranger Garza helped them in their investigation. Ranger Garza and the Elgin police interviewed defendant, who voluntarily gave samples of his blood, hair and saliva.

Ranger Garza testified that he met with Blanca's friend Josefina Cuellar in Texas in February 1996 and that she appeared fearful and would not speak with him at that time. Ranger Garza and Sergeant Jim Barnes of the Elgin police department spoke with Cuellar initially in April 2002 and then returned later that month and presented Cuellar with new information that they obtained from her former employer. On April 25, 2002, Garza accompanied Cuellar to Chicago and was present when she was interviewed by the State's Attorney's office and gave a videotaped interview.

Following Ranger Garza's testimony, defense counsel made a motion for a mistrial, arguing that the State, through Ranger Garza's testimony, had implied that defendant killed his mother and thereby exceeded the trial court's ruling on the motion *in limine*. The trial court denied defendant's motion, stating that Ranger Garza had testified as to the steps in his investigation and that the court had sustained defense counsel's objections to questions regarding the substance of the conversations between Ranger Garza and the Elgin police.

Elgin police officer William Wood testified that in January 1996, after receiving a phone call from the Texas Ranger's office, he was assigned to investigate Angelita's death. Officer Wood spoke to Ranger Garza about a "case they had down there," and on February 21, 1996, he went to Texas with his partner and shortly thereafter met with defendant. Defendant was taken to

a hospital where his blood was taken, and Officer Wood also obtained saliva and hairs from defendant's head and pubic area. These items were subsequently sent to the Illinois State Police crime lab.

Josefina Cuellar, a resident of Corpus Christie, Texas, testified that Blanca moved to Texas shortly after Angelita's funeral in 1991. In May 1995, Cuellar visited Blanca and defendant in a hospital in Texas. According to Cuellar, defendant became upset during the visit, exposed himself to the two women, and told them that "when he got out of [the hospital], he was going to kill a lot of people, and that [Cuellar and Blanca] were going to be the first ones." Defendant also told Blanca and Cuellar "that he was going to f--- both of [them], like he had done with Angie when he killed her," and that "he had f---ed Angie all night long, even though she was dead." Cuellar and Blanca then left the hospital and Cuellar took Blanca to her sister's home.

Approximately four weeks later, defendant and Blanca visited Cuellar at her home. Over defense counsel's objection, Cuellar testified that, during that visit, Blanca told Cuellar that she was moving back to Chicago because "she felt guilty because she knew all the time who had killed Angie," and that "she knew all the time it was him." Defendant then became upset and told Blanca that she did not have to discuss their problems with Cuellar and that "he was going to kill both [Blanca and Cuellar], like he had done with Angie." The trial court instructed the jury that Blanca's statement that "she knew all the time it was him" was not being offered to prove who killed Angelita, but rather "for the limited purpose of showing why a person said what a person said."

On cross-examination, Cuellar acknowledged that she did not tell the police or anyone else

6

that defendant had made those statements until she disclosed them to authorities on April 17, 2002. Prior to that, Cuellar was questioned by authorities about Angelita's murder on April 15, 2002, and told them that defendant had said that when he got out of the hospital he was going to kill a lot of people and that Blanca and Cuellar would be the first. She did not mention defendant's threat to have sex with her and Blanca nor his admission to sexually assaulting and killing Angelita. She also did not mention the statement defendant made at her home approximately four weeks after the 1995 hospital visit.

On redirect examination, Cuellar testified that she did not go to the police with defendant's statements because she was afraid of him. When Cuellar spoke with the police on April 17, 2002, they presented her with information from her former employer who told police that Cuellar had told him that defendant threatened to rape and kill her and Blanca, as he had done to Angelita. Cuellar then became upset and told police all of the statements that defendant had made to her.

Kristen Boster, a forensic scientist with the Illinois State Police forensic crime lab from 1992 to 2000, testified that in 1996 she received evidence collected from the crime scene for DNA analysis. This evidence included blood standards from Angelita and defendant as well as the vaginal and rectal swabs taken from the sexual assault kit performed on Angelita's body. She performed a DNA extraction on the rectal swabs, but she did not perform an extraction on the vaginal swabs because they contained an insufficient amount of sperm cells. The rectal swab contained two sources of DNA: female DNA, which was present because the victim was female, and male DNA from the sperm cells. There was a large amount of DNA in the nonsperm (female)

faction, but the DNA from the sperm fraction was small and degraded and insufficient for analysis. She sent a small portion of that DNA, as well as DNA from Angelita and defendant's blood standards, to a private lab for a different type of DNA analysis.

Dr. Robin Cotton, an expert in DNA analysis who works for a private DNA testing company, testified that in 1996, she examined the DNA extracted from Angelita's rectal swab and compared that to the known samples of DNA from defendant and Angelita. According to those tests, defendant was a possible contributor to the sperm found on the victim, and the frequency given to this "match" was 1 in 140,000. Dr. Cotton also testified that the science of DNA testing has advanced significantly since the analysis in this case was performed in 1996.

Laurie Lee, a forensic scientist with the Illinois State Police crime lab and a specialist in hair microscopy, or the comparison of hairs and fibers, testified that through hair examination she could determine whether a hair came from an animal or a person and, if the hair was from a human, the race of that person, the body part from which the hair originated, and whether the hair was artificially treated or forcibly removed. Lee also testified that a hair cannot be positively identified as having come from a particular individual but that, in most cases, an individual can be excluded as a possible source of that hair and it can be determined if a hair is dyed.

Lee testified that in March 1996, she received the hairs and fibers collected from Angelita's body and the evidence from the sexual assault evidence kit, which included a liquid blood sample, vaginal swabs and smear, rectal swab and smear, dried blood and saliva samples, head hair standards, pubic hair combings, pubic hair standards, hairs and fibers from the sheet in which Angelita was wrapped, and head hair standards from defendant. Lee compared the hairs

collected at the crime scene to known hair standards of defendant and Angelita. Lee observed color-altered or dyed hairs that were collected from Angelita's right hand, left hand, right chest abdomen, and left hip, and the sheet in which Angelita's body was wrapped. Lee's comparison of those hairs to standards from defendant and Angelita revealed that the dyed hairs did not originate from Angelita and were inconclusive with respect to defendant. Lee explained that it was not valid to compare the dyed hairs to defendant's hair and that the dyed hairs were inconclusive with respect to defendant because she received defendant's head hair standards more than five years from when the dyed hairs were shed and that, in the course of five years, all of the hairs on a person's head have been "changed out" and the person has completely different hair. In 2001, Lee submitted four of the color-altered hairs for mitochondrial DNA (mtDNA) analysis.

On cross-examination, Lee testified that she did not compare the dyed hairs to Blanca's hair because she did not have a hair standard from Blanca and, therefore, it was possible that the suspect hairs came from Blanca.

Dana Pitchford, a forensic scientist and specialist in DNA analysis with the Illinois State Police crime lab, testified that in 2001 she analyzed the sperm fraction from Angelita's rectal swab using the most current form of DNA analysis. The sperm fraction from the rectal swab contained a full nuclear DNA profile, and Pitchford testified that, in her expert opinion and within a reasonable degree of scientific certainty, that DNA profile matched defendant's DNA profile. Pitchford opined that the probability of this match, or finding defendant's DNA profile, was 1 in 180 billion, and that the odds of randomly matching that profile was "impossible" and "not going to happen." Moreover, the probability of the match with defendant's profile was not affected by

9

the fact that defendant and Angelita were half brother and sister.

Pitchford further testified that she also performed a DNA extraction on Angelita's vaginal swabs. She identified a mixture of DNA profiles as a combined profile of Angelita and defendant. However, the amount of DNA extracted from the vaginal swabs was relatively small and the probability of finding that profile was 1 in 62.

Dr. Constance Fisher, an expert in the field of forensic mtDNA analysis with the FBI, explained the difference between nuclear and mtDNA. Nuclear DNA is unique in every individual except for identical twins, whereas mtDNA is not unique to an individual and is shared by all maternal relatives. Dr. Fisher explained that an mtDNA profile can be obtained from types of evidence from which a nuclear DNA profile could not be obtained, such as a hair shaft without any attached tissue.

Dr. Fisher testified that she received the four color-treated hairs for mtDNA testing. Three of the color-treated hairs shared the same mtDNA sequence as defendant's and Angelita's mtDNA, meaning that neither could be excluded as a source of those hairs. However, because all maternal relatives share the same mtDNA, Fisher opined that based on mtDNA alone, neither defendant, Angelita, nor their mother could be excluded as a possible source of the three color-treated hairs. She acknowledged that a cousin who shared the same matrilineal line of descent would also have the same mtDNA sequence. Fischer also explained that the mtDNA sequence shared by Angelita and defendant was rare and would expect to be seen in no more than .39% of the Hispanic population, or approximately 4 out of every 1,000 unrelated Hispanics. One of the color-treated hairs contained insufficient DNA to obtain an mtDNA sequence.

The parties stipulated that if called to testify, Sergeant Paul McCurton would testify that on February 9, 1991, he contacted Blanca at her residence and requested that it be searched for any blunt objects that may be missing, that the residence was searched, and that no such objects were found to be missing.

The jury found defendant guilty of first degree murder. After defendant was found eligible for the death penalty, the trial court sentenced him to a term of natural life in prison. This appeal followed.

Defendant first contends that the trial court erred by admitting other crimes evidence. Specifically, defendant asserts that the trial court abused its discretion by allowing the State to introduce details of Blanca's murder through the testimony of Ranger Garza.

The determination as to whether evidence is relevant and admissible is within the sound discretion of the trial court, and its ruling will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001).

The record shows that, prior to trial, the State filed a motion *in limine* seeking to introduce evidence of Blanca's 1996 murder. The State claimed that defendant murdered his mother to prevent her from implicating him in Angelita's murder and that both Blanca and Angelita were murdered in a similar manner. Thus, the State argued that evidence of Blanca's murder was admissible as other crimes evidence in order to establish defendant's consciousness of guilt and *modus operandi* as well as to describe the circumstances leading to defendant's arrest. The trial court ruled that the details of Blanca's murder could not be used as other crimes evidence because there was no evidence connecting defendant to that crime and therefore barred

11

the State from implying that defendant committed that murder. The court also ruled, however, that the witnesses could testify to the steps that were taken during the course of their investigation.

Pursuant to the trial court's ruling, Ranger Garza testified that he was assigned to investigate Blanca's murder in 1996. Ranger Garza testified that he initially helped excavate Blanca's body, which was located in a shallow grave in a semi-brushy area approximately 60 yards from her apartment complex. According to Ranger Garza, Blanca's body was naked from the waist down and wrapped neatly in a bed sheet, which matched the bedding that was inside her apartment. There were no signs of forced entry into Blanca's apartment, and the medical examiner ruled that the cause of death was strangulation and that Blanca was suffocated by a plastic shopping bag being placed over her head. Ranger Garza further testified that he contacted the Elgin police after Blanca was murdered, that he helped the Elgin police in their investigation when they subsequently came to Texas, and that he and the Elgin police interviewed defendant in Texas and obtained samples of his blood, hair and saliva.

Defendant claims that Ranger Garza's testimony constituted improperly admitted other crimes evidence. Defendant asserts that this testimony served no legitimate purpose because the evidence was insufficient to connect him to Blanca's murder and that admitting details of that murder was highly prejudicial because it conveyed to the jury that he murdered his mother. The State responds that testimony regarding the investigation into Blanca's death was properly admitted to explain the course of the investigation that led to defendant's arrest and that, because this testimony was not other crimes evidence, the State was not required to show a nexus between

defendant and Blanca's murder. Alternatively, the State argues that if the testimony constituted other crimes evidence, any error in its admission was harmless in light of the overwhelming evidence of defendant's guilt.

We find that the testimony regarding Blanca's death was properly admitted in order to explain the course of the police investigation into Angelita's murder and the events leading to defendant's arrest. Our supreme court has recognized that evidence of the course of the investigation into a crime and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case. See *People v. Hayes*, 139 Ill. 2d 89, 130 (1990) (police testimony regarding unsuccessful attempts to locate defendant admitted to explain the two-week delay between when defendant was identified by a witness and when he was arrested), *overruled on other grounds*, *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002); see also *People v. Johnson*, 114 Ill. 2d 170, 193-94 (1986) (witness testimony that she notified police of an unrelated incident with defendant, which ultimately led to defendant's identification and arrest, admitted to rebut suggestion that police unjustifiably targeted defendant eight months after the offenses occurred); *People v. Byrd*, 43 Ill. App. 3d 735, 742 (1976) ("Informing the trier[] of fact of consequential steps in the investigation of a crime is normal procedure and is important to the full presentation of the State's case").

In this case, the trial court reasonably could have concluded that testimony regarding the investigation into Blanca's death was relevant and necessary to explain to the jury the lengthy course of the investigation that began with Angelita's murder in Illinois in 1991 and culminated with defendant's arrest in Texas in 2002. Most importantly, Ranger Garza's testimony explained

why the investigation into Angelita's murder was reopened in 1996, approximately five years after the crime occurred and after the case had gone "cold." Without such testimony, the jury could have been left to wonder why police focused their investigation on defendant, Angelita's half brother. See *Byrd*, 43 Ill. App. 3d at 742 (noting that the State must be permitted to make some explanation why a previously unidentified defendant was arrested and shown to the victim of a crime because "[i]f this were not permitted defense counsel could play upon it in argument, asking why the defendant - of all the men in the world - was on trial, insinuating that the accused was arrested without reason").

To that end, the record shows that Ranger Garza's testimony was limited to explaining the steps in the investigation into Angelita's murder, specifically those that developed in 1996 when Blanca was found dead. Ranger Garza did not testify that defendant was a suspect in Blanca's murder, and the trial court sustained several of defense counsel's objections and thereby precluded Ranger Garza from testifying to the contents of his conversations with the Elgin police. The record also shows that the prosecution abided by the court's ruling during opening and closing statement and did not imply to the jury that defendant was a suspect in Blanca's murder. In opening statements, the prosecution told the jurors that they would hear evidence that the investigation into Angelita's murder became a "cold case" in 1991, that Blanca was found murdered in Texas in 1996, and that the investigation into Blanca's death "jumpstart[ed]" the investigation into Angelita's murder. In closing arguments, the prosecution made only a passing reference to Garza's testimony, telling the jury that it was important because "it show[ed] why, after so many years, this case was re-opened."

14

Our review of the record therefore establishes that the State did not introduce evidence that defendant committed other, unrelated crimes. Rather, it introduced relevant evidence of the course of the investigation into Angelita's death and of the events leading to defendant's arrest. Even assuming, as defendant argues, that it was unnecessary to elicit the details of the condition in which Blanca's body was found, the trial court ultimately weighed the probative value of Ranger Garza's testimony against its prejudicial effect. Under the totality of the circumstances, we cannot say that the trial court abused its discretion by allowing testimony regarding Blanca's death.

Moreover, even if the testimony regarding Blanca's death, including details of the manner in which her body was found, constituted improperly admitted other crimes evidence, we find that the error was harmless error in light of the overwhelming evidence of defendant's guilt. Our supreme court has repeatedly held that the improper introduction of other crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. See, *e.g.*, *People v. Nieves*, 193 Ill. 2d 513, 530 (2000); *People v. Hall*, 194 Ill. 2d 305, 339 (2000) ("Although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different").

In this case, forensic scientist Pitchford testified that the sperm found in Angelita's rectal swab matched defendant's nuclear DNA profile and that the probability of that match occurring was 1 in 180 billion. Dr. Fisher's testimony established that the color-treated hairs found on Angelita's body contained defendant's mtDNA. In addition to the uncontested DNA evidence,

15

Cuellar testified to several incriminating statements made by defendant. Specifically, in May 1995, defendant told Cuellar and Blanca that when he got out of the hospital "he was going to f--- both [Cuellar and Blanca], like he had done with Angie when he killed her," and that "he had f----d Angie all night long, even though she was dead." Approximately four weeks later, when defendant and Blanca were at Cuellar's home, defendant said that "he was going to kill both [Blanca and Cuellar], like he had done with Angie." Moreover, Pozos testified that he saw defendant in the home he shared with Angelita and others only hours after Angelita was last seen alive, and the testimony also established that defendant was never seen joining in the search for Angelita after she was missing. Given this overwhelming evidence of defendant's guilt, and the fact that the State, as previously noted, did not emphasize Ranger Garza's testimony during opening or closing arguments, we cannot say that the result of defendant's trial would have been different had the testimony regarding Blanca's death been excluded. Accordingly, any error in admitting that testimony was harmless. See *Nieves*, 193 Ill. 2d at 530-31 (finding that prejudicial effect from isolated reference to defendant's criminal activity in another state was overshadowed by the substantial evidence of defendant's guilt); *Hall*, 194 Ill. 2d at 340 (improper testimony that defendant abused his spouse was not a material factor in conviction and therefore did not warrant reversal where evidence of defendant's guilt was overwhelming); *People v. Lewis*, 165 Ill. 2d 305, 347 (1995) (testimony that defendant was already in custody while police were searching for him, admitted to show steps in the police investigation, was not unduly prejudicial where the jury heard neither direct evidence nor argument regarding the reason defendant was in custody).

Defendant attempts to mitigate this overwhelming evidence by pointing to the testimony

of the medical examiner, Dr. Blum, that the autopsy could not definitively rule out consensual sex as a separate occurrence from the homicide. However, there was absolutely no evidence presented at trial to suggest that defendant had consensual intercourse with Angelita. In fact, defendant made a statement to Cuellar and Blanca that he had sex with Angelita after he had killed her. Moreover, Dr. Blum also testified that the lack of blunt trauma or bruising to Angelita's vaginal or rectal areas was consistent with a women who had given birth and who had possibly been sexually assaulted, and Pozos testified that Angelita had given birth to their child.

Defendant also attempts to mitigate the overwhelming evidence by arguing that because all maternal relatives share the same mtDNA, neither defendant, Angelita, Blanca, nor "cousin Tony" could be excluded as a source of the color-treated hairs. Defendant further points to Torrisi's testimony regarding Macard's Principle and hair transfers among people who live together, and argues that because defendant, Angelita, Blanca and Tony all lived in the same home, none could be excluded as the source of the dyed hairs. However, Lee's testimony established that the color-treated hairs did not originate from Angelita. Moreover, although mtDNA analysis could not eliminate Blanca or Tony as the source of those hairs, we nevertheless believe that the mtDNA evidence, considered along with the other evidence presented at trial, overwhelmingly proved defendant guilty beyond a reasonable doubt.

In reaching this conclusion, we reject defendant's claim that the error in admitting the other crimes evidence was compounded when the trial court failed to give the jury a limiting instruction regarding the purpose for which it could be considered. Initially, we find that defendant has waived this claim because he did not request a limiting instruction or raise this

1-06-0271

particular claim in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failure to raise objection at trial and include the objection in a posttrial motion results in waiver of that issue on appeal). Even absent waiver and assuming that testimony regarding Blanca's death constituted other crimes evidence, the State did not emphasize the testimony during opening or closing arguments and any error by the court in failing to instruct the jury would be harmless in light of the overwhelming evidence of defendant's guilt. See *People v. Jackson*, 357 Ill. App. 3d 313, 321-22 (2005) (finding trial court's failure to give a limiting instruction to the jury regarding other crimes evidence harmless where the evidence of defendant's guilt was not closely balanced).

Defendant next contends that the trial court erred by admitting alleged hearsay testimony. As previously noted, we review the trial court's decision as to the relevance and admissibility of evidence under an abuse of discretion standard. *Morgan*, 197 Ill. 2d at 455.

Defendant initially claims that the trial court abused its discretion by admitting into evidence Blanca's statements that "she knew all the time it was him."

The record shows that under direct examination, Cuellar testified that she was visited at her home by defendant and Blanca in June 1995. Over defense counsel's objection, Cuellar testified that, during that visit, Blanca told her that "she felt guilty because she knew all the time who had killed Angie," and that "she knew all the time it was him." According to Cuellar, defendant then became upset and said that "he was going to kill both [Blanca and Cuellar], like he had done with Angie." The trial court instructed the jury that Blanca's statement was being offered for the limited purpose of showing "why a person said what a person said," that it was not being offered to show who killed the victim, and that the jury "should not" consider the statement

18

for that purpose.

Defendant asserts that Blanca's statement to Cuellar was inadmissable hearsay because it placed into evidence the substance of Blanca's out-of-court conversation with Cuellar, and that the statement was highly prejudicial because it conveyed to the jury that even defendant's own mother believed he was guilty of Angelita's murder. Defendant also claims that Blanca's statement constituted improper opinion testimony because there was no evidence to indicate that she had personal knowledge of the events surrounding Angelita's death. We disagree.

" 'To qualify as hearsay, an out-of-court statement must be offered to establish the truth of the matter asserted.' " *People v. Rivas*, 302 Ill. App. 3d 421, 431 (1998), quoting *People v. Simms*, 143 Ill. 2d 154, 173 (1991). Moreover, an out-of-court statement offered to prove its effect on a listener's mind or to show why the listener subsequently acted as he did is not hearsay and is admissible. *People v. Thomas*, 296 Ill. App. 3d 489, 499 (1998).

In this case, our review shows that Blanca's statement was not offered to prove the truth of the matter asserted therein, *i.e.*, that Blanca knew defendant killed Angelita, but rather to explain why defendant subsequently stated that "he was going to kill both [Blanca and Cuellar], like he had done with Angie." Accordingly, Blanca's statement did not constitute hearsay and we find no abuse of discretion in its admission into evidence.

Defendant's argument that Blanca's statement should not have been related to the jury because she had no personal knowledge of the events surrounding Angelita's death is likewise without merit. Defendant's argument again assumes that Blanca's statement was being offered as substantive evidence of his guilt. However, as noted, Blanca's statement was not offered to prove

19

that defendant killed Angelita, and therefore whether Blanca had personal knowledge is irrelevant in determining whether the trial court abused its discretion by admitting Blanca's statement into evidence.

We also reject defendant's argument that Blanca's statement was highly prejudicial. Initially, the trial court gave the jury a limiting instruction regarding Blanca's statement. Although defendant claims that instruction was "weak" because it contained no definitive prohibition against considering the statement substantively, our review establishes that the trial court's admonitions sufficiently conveyed to the jury the limited purpose for which it could consider Blanca's statement. There is a strong presumption that jurors follow the instructions given by the court (*Simms*, 143 Ill. 2d at 174), and nothing in the record rebuts that presumption.

Furthermore, the admission of hearsay evidence is harmless error if there is no reasonable probability the verdict would have been different had the hearsay been excluded. *People v. Sample*, 326 Ill. App. 3d 914, 924-25 (2001). In this case, the evidence against defendant was overwhelming, and we therefore conclude that the result of defendant's trial would not have been different had Blanca's statement been excluded. *Sample*, 326 Ill. App. 3d at 925.

Defendant also claims that the trial court erred by allowing the State to play a portion of Cuellar's videotaped statement on redirect examination in which Cuellar related a statement made by Blanca to "Lucinda."

The record shows that, during Cuellar's cross-examination, defense counsel played various portions of Cuellar's videotaped statement in an effort to discredit her trial testimony. In one particular portion of that cross-examination, defense counsel played an answer that Cuellar

gave in response to an assistant State's Attorney's request that she relate the entire conversation that took place in 1995 when Cuellar visited Blanca and defendant in the hospital. Defense counsel then played Cuellar's videotaped answer, in which she related the conversation and events that took place during that visit, including defendant exposing himself and making threats to Cuellar and Blanca. The final three sentences of that answer that were played to the jury were as follows: "So we went to eat. But I never forgot about that. Then in the restaurant, [Blanca] wanted me to take her to Alice because her car had broken, and we went to Alice." Defense counsel then stopped the videotape and asked Cuellar if she gave that answer. The State objected that Cuellar's entire answer to that question had not been played. Defense counsel responded that the entire answer had been played, and the court ruled that the State could bring the entire answer out on redirect examination.

While at a sidebar during Cuellar's redirect examination, the State informed the court that it intended to play Cuellar's entire videotaped statement, arguing that defense counsel had taken the statement out of context. The trial court stated that "it was fairly disjointed when [defense counsel] did it," and ruled that the statement, including any prior consistent statement contained therein, rebutted the inference of recent fabrication which had been implied by defense counsel during Cuellar's cross-examination. The State proceeded to play the videotaped statement, including the answer that Cuellar gave to the assistant State's Attorney that the State had argued was incomplete. That answer ended with the following two sentences, which had not been played by defense counsel: "And that was when she talked about the case with Lucinda. Then told her, Lucinda, that he had said that he was going to kill us and f--- us both." Defense counsel objected,

and the court ruled that defense counsel had brought the answer out on cross-examination and that the State was permitted to show that the answer was incomplete.

Defendant claims that Blanca's statement was inadmissible hearsay that served no legitimate purpose. Defendant further asserts that because the statement was played over defense counsel's objection and without a limiting instruction, the jury was given the impression that it could consider the statement for its truth. Defendant claims that the error was prejudicial because it bolstered Cuellar's credibility, which was a pivotal issue at trial.

We initially note that defendant has waived his claim regarding the lack of a limiting instruction because he did not request the jury be given a limiting instruction. See *People v. Smith*, 362 Ill. App. 3d 1062, 1082 (2005) (noting that the failure to request a limiting instruction results in waiver of any objection on appeal to the lack of a limiting instruction).

Moreover, although a prior consistent statement is normally inadmissible hearsay, such a statement is admissible when it rebuts a charge of recent fabrication and when it was made prior to the alleged fabrication. *People v. Richardson*, 348 Ill. App. 3d 796, 802 (2004). Our review of the record reveals that defense counsel's cross-examination of Cuellar was focused on discrediting her testimony by playing portions of her videotaped statement, and that the trial court had a reasonable basis for characterizing that use of the tape as "disjointed" and therefore allowing the state to play the entire statement. Moreover, the record shows that defense counsel brought out the specific disputed answer on cross-examination and that counsel played an incomplete answer before asking Cuellar, "Did you answer the question in that way?" Under these circumstances, we cannot say that the trial court abused its discretion by allowing the State

22

to play the portion of Cuellar's videotaped statement in which she related the statement made by Blanca to Lucinda.

Finally, we find that any error by the trial court in allowing the disputed portion of Cuellar's videotaped statement was harmless. Although defendant claims that the State emphasized Blanca's statement to Cuellar during rebuttal closing arguments, the record shows that the State made one reference to the statement during closing arguments. In light of the overwhelming evidence of defendant's guilt, we cannot say that the result of defendant's trial would have been different had the State not made this reference or had the disputed portion of the videotaped statement not been played. *Sample*, 326 Ill. App. 3d at 925.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

J. GORDON and O'MALLEY, JJ., concur.