2020 IL App (2d) 170344-U
No. 2-17-0344
Order filed May 14, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-602 |
| MICAH WILLIAMS, | ) ) | Honorable Christen L. Bishop, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err by failing to allow as impeachment evidence testimony that the victim told defendant's mother that nothing happened on the day of the incident; further, the evidence of defendant's guilt was not closely balanced. Trial court is affirmed.

¶ 2   In this direct appeal of his predatory criminal sexual assault and aggravated criminal sexual abuse convictions, defendant, Micah Williams, raises one issue. Defendant argues that the trial court committed plain error by refusing to consider his mother's testimony as impeachment of the alleged victim's testimony. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On March 25, 2015, a grand jury indicted defendant on two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) and (11-1.60(c)(1)(i) (West 2014)). All four counts alleged that defendant committed the offenses against A.M. on March 8, 2015. Counts one and two alleged that defendant, who was 17 years of age or older, committed the offense of predatory criminal sexual abuse against A.M. Count one alleged that defendant "committed an act of sexual penetration with A.M. *** in that said defendant placed his finger int the sex organ of Minor, A.M." Count two alleged that defendant "committed an act of sexual contact with Minor, A.M., *** in that the said defendant knowingly touched Minor A.M. about the sex organ with his finger." Counts three and four alleged that defendant committed the offense of aggravated criminal sexual abuse. Count three alleged that "defendant, a family member of Minor A.M., *** knowingly touched Minor A.M. about her vagina for the purpose of the sexual gratification of the defendant." Count four alleged that "defendant, who was 17 years of age or older, *** knowingly touched Minor A.M. about her vagina."

¶ 5      On May 13, 2015, the State added three counts to the indictment, alleging that defendant committed offenses against A.M. between November 1, 2014 and January 31, 2015. Count five charged defendant with predatory criminal sexual assault of a child (*id.* at (11-1.40(a)(1)), alleging that defendant "committed an act of sexual penetration with Minor A.M. *** in that the said defendant placed his finger into the sex organ of Minor A.M[.]" Count six charged defendant with the same offense as count five, but alleged that defendant "committed an act of sexual contact with Minor, A.M. *** in that the said defendant knowingly touched Minor A.M. about the sex organ with his finger[.]" Count seven charged defendant with aggravated criminal sexual abuse

(*id*. at § 11-1.60(b)), alleging that "defendant, a family member of Minor A.M., committed an act of sexual conduct with Minor A.M., *** in that the said defendant knowingly touched Minor A.M. about the vagina for the purpose of sexual gratification of the defendant[.]"

¶ 6 Prior to trial the trial court granted the State's motion to admit under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2016)) statements A.M. made on March 8, 2015, to her mother, Amorette S., her maternal grandmother, Crystal F.-L., her maternal aunt, Jasmin S., and a nurse, Chenel Vandenberk, and statements A.M. made a few day later to a forensic examiner, Lynn Aladeen.

¶ 7                                   B. Trial

¶ 8 On January 23, 2017, a bench trial began and was continued from time to time until its conclusion on March 16, 2017. A.M. testified that she was nine-years' old at the time of the trial and was seven years' old at the time of the incidents at issue. One morning when A.M. was seven, she was sleeping in her mother's bed and her mother was at work. A.M. wore shorts and a shirt. Defendant slept next to A.M. A.M. testified that, defendant pulled her pants down and "took his fingernail and touched me in my private part [and] was putting [*sic*] in a circle." She did not recall the length of time this occurred. After this incident, A.M. got up and went to school. A.M. called her vagina her "private" or "private part." Defendant actually put his fingernail "in" A.M.'s private part. A.M. did not tell anyone at school what defendant had done. She did not tell her mother, Ami, or Ami's mother, Grandma C.

¶ 9 A.M. testified that this happened a second time, on March 8, 2015, again while she was sleeping in the bed that her mom shared with defendant. A.M. slept between defendant and her mom. A.M.'s mom slept on her side facing away from A.M. but did not remember if defendant slept on his side. A.M. wore shorts and underpants. Defendant pulled A.M.'s underpants down

to her thigh area, and then "took his fingernail and touched me in my private part." A.M. also testified that defendant "took his fingernail and touched my vagina." Defendant put his fingernail "inside" A.M.'s vagina and moved it in a circle. Defendant had long, sharp fingernails, and A.M. testified that it "hurt a lot." A.M. did not recall how deep defendant's fingernails went inside of her. When defendant was done, he told A.M. to get ready for school.

¶ 10    During cross-examination, A.M. testified that she did not cry out or jump in response to the pain. A.M. did not remember if defendant warned her not to tell anyone what he had done to her. After defendant put his fingernail in her vagina, A.M. used the toilet. As she was "peeing," it burned inside her vagina. Defendant had "long" fingernails. When asked when she first learned what a vagina was and when she first heard the word vagina, A.M. replied, "I was eight." A.M. testified that her mother told her what a vagina was because "my mom told me that if someone ever touches you, tell me." A.M. testified that her mother had this conversation with her when she was "seven and eight" and that was also when she told A.M. what a vagina was. A.M. used the word "vagina" when she spoke with her mother, Grandma Crystal, and Aunt Jasmin on March 9, 2015. Later, during cross-examination, A.M. testified that when she was 7-years old her mother told her what a private part was but she did not use those words; rather, she used the word "vagina." The first time A.M.'s mother told A.M. about "that area of her body" she "sometimes" called it "private part." A.M. knew that her vagina and private parts are between her legs, in between the top of her thighs, and are covered by her underwear. A.M. denied that her "butt" was a "private part." A.M. denied that, when she peed the morning of the incident, it burned outside of her vagina; rather she testified that it burned inside her vagina.

¶ 11    During cross-examination the following colloquy occurred:

"Q. Okay. Do you remember on the morning of the 8th talking on the cellphone with [defendant's] mom, Mary Williams?

A. I do not remember.

Q. Do you remember much of what happened that morning of March 8?

A. I remember everything that happened.

Q. Okay. But you said that you don't remember what you were wearing that morning?

A. Yes.

Q. And you don't remember talking to Grandma Williams on the phone, right?

A. I do not remember that."

¶ 12    During cross-examination, A.M. also testified as follows. A.M. testified that if her mom and Aunt Jasmin told her that something happened, she believed them. A.M. used to call defendant "daddy." She lived with him and knew him for about five years before the trial. Defendant liked to joke around with A.M. and tickle her. On March 8, 2015, after the incident, Ami, and Grandma C., talked to defendant for hours. A.M. denied being in the room during the conversation about what happened; A.M. was in her room. A.M. heard what Grandma C. was saying to defendant; she was talking loudly, and she was pretty upset.

¶ 13    During cross-examination A.M. also testified that defendant was a "funny guy" who liked to "joke around" with her. Sometimes he tickled her arms and feet. A.M. was ticklish and she squirmed and jumped around a lot when defendant tickled her. A.M. did not remember if defendant ever tickled her legs. She denied that defendant tickled her vagina. On March 8, 2015, A.M. had scratches on her body that were caused by Grandma C's kitten. A.M. did not recall having any scratches on her right leg.

¶ 14    Jasmin S., A.M.'s maternal aunt, testified as follows.  On March 8, 2015, Jasmin went to her sister, Ami's house, and made her way to A.M.'s bedroom.  After Jasmin and A.M. talked about A.M.'s hamster, Jasmin asked her what kind of mood she was in.  A.M. said she was fine, until defendant "did what he did."  Jasmin asked, "What happened?"  A.M. replied, that defendant had "touched" her.   Jasmin asked how defendant had done that and A.M. said, "in the bed and she said that he hurt her."  Jasmin used a Teddy bear that A.M. had in her bedroom to have A.M. show how defendant had touched her.  The Teddy bear was dressed in a cheerleader's outfit.  A.M. pulled the bear's skirt and underpants down to its mid-thigh.  While "kind of giggling," A.M. extended one of her fingers, pointed it between the bear's legs, and then bending it halfway and bringing it back towards her body.   The bear was not anatomically current in that it did not have a vagina.

¶ 15    A.M. told Jasmin that defendant "stuck his finger inside her" for "three to five seconds." Because Jasmin knew that defendant claimed that he only tickled A.M., she asked A.M. to show her what tickling meant.  A.M. moved her finger "back and forth" on Jasmin's arm.  Jasmin asked A.M. if that is what defendant did to her.  A.M. replied that defendant had "poked" her twice in the stomach without saying anything, and "then pulled down her pants and underwear and stuck his finger inside of her."   A.M. told Jasmin that defendant did this to her twice but she did not tell anyone after the first incident because it happened in the morning, she went to school, and when she got out of school she forgot.  But this second time A.M. told people about it because when she went to the bathroom, it burned, and defendant hurt her.  At some point during Jasmin's conversation with A.M., Jasmin used her cell phone to make a video to capture what A.M. had already said.  The video was admitted into evidence and played for the court.

¶ 16    During cross-examination Jasmin testified that during the video A.M. giggled and appeared to be moving without any discomfort.   Also, during the video, Jasmin repeated "some" of her previous questions to A.M. but A.M. did not say that defendant put his finger inside her body or inside her vagina.  Jasmin testified that she did not recall hearing A.M. use the term "private parts."  Jasmin did not have A.M. use the Teddy bear to indicate what areas of the body were considered "private parts," and Jasmin did not determine whether A.M. considered that "private part" included any area covered by her underwear.  Jasmine never heard A.M. use the word "vagina" before March 8, 2015.  Jasmin assumed that when A.M. said that defendant put his finger inside of her, she meant inside of her vagina.  Jasmin testified,

> "I never asked her what she thought a vagina or a private part was, but when she said he put his finger inside of her, she knew exactly what she meant because she never said he put it between her legs or anything like that, she said inside of her so she definitely knew what it was.  *** She's seven years old.  She's old enough to know.  But, as a little girl, I don't know if she knew the terms or even if I were to use the terms with her, I'm not sure she would know."

Jasmin never asked A.M. how deep defendant's finger went into A.M.  A.M. did not tell Jasmin that defendant had tickled her that day.

¶ 17    Amorette S., A.M.'s mother, testified as follows.  Defendant was Amorette's boyfriend and had lived with her and A.M. since A.M. was about two-years old.  A.M. called defendant "daddy."  When Amorette woke up the morning of March 8, 2015, A.M. was sleeping in between Amorette and defendant.  Amorette was eight-months pregnant at the time.  When A.M. woke up, defendant was downstairs.  Amorette told A.M. and her brother to get ready to go to a birthday party, to brush their teeth, and to go to the bathroom.  As A.M. was "using the toilet" she told

Amorette that "it was burning when she was going pee." Amorette told A.M. that she might have a urinary tract infection and that she would make a doctor's appointment for her the next day. Then Amorette returned a phone call to her mother, Crystal, and told Crystal that she may need Crystal to take A.M. to the doctor the next day because she had to work. Amorette told Crystal that it burned when A.M. "went to the bathroom," and that A.M. might have a urinary tract infection. Crystal asked "why?" and A.M., who heard Crystal because the call was on speaker phone, replied "because daddy scratched me."

¶ 18    Amorette then drove home A.M.'s friend, who had slept over the night before, and A.M. went along for the ride. When Amorette and A.M. returned home, Crystal, who had driven over to the house, entered Amorette's vehicle and spoke with A.M. At some point, Amorette's sister, Jasmin also came to the house. Later, Amorette, Crystal, and defendant went to the Round Lake Beach police station. Subsequently, Amorette took A.M. to Condell Medical Center.

¶ 19    During cross-examination Amorette testified as follows. When Amorette woke up the morning of March 8, A.M. was fully clothed; neither her pants nor her underwear was pulled down. When Amorette awoke, A.M. did not cry or yell at anyone, and she did not complain that something happened to her. A.M. did not wake Amorette to complain about something happening to her, and Amorette did not hear or feel anything that woke her. A.M. told Amorette that morning that defendant had tickled her on her thighs. Amorette testified that defendant "would tickle the kids a lot." When Amorette asked A.M. why it burned when she peed, A.M. replied, "I don't know." Amorette did not ask A.M. exactly where she felt the burning sensation. Amorette "just automatically jumped to "you need to drink more water, maybe you have a urinary tract infection."

¶ 20    When Amorette called Crystal, A.M. could hear their conversation because she was in the room with Amorette and the call was on "speaker phone." During the phone call, when A.M. said

that it burned because defendant scratched her, A.M. did not specify where he scratched her. After A.M. told Amorette what defendant did, she "panicked," freaked out, and told Crystal to come over. After Amorette ended the phone call with Crystal, she went downstairs and told defendant what A.M. had said. Defendant went upstairs to A.M.'s bedroom where she was on her top bunk bed. Defendant tried to talk to A.M. but A.M. said she did not want to talk to defendant and she kept moving away from him.

¶ 21 Prior to March 8, 2015, A.M. never told Amorette that anyone had touched her inappropriately, even though Amorette had asked, "just to make sure [her] kids were safe." Previously, Amorette explained to A.M. that she had a vagina. Amorette testified that she taught her kids "their privates." Amorette was a victim of sexual abuse,

> "so I always told them this is your vagina, this is your penis. People are not allowed to touch you in those places, and if they do you need to tell an adult. It's not okay. People are not allowed to cross those boundaries. So they know their boobs, their private parts, their vagina is a private part. *** They know their butt is a private part."

A.M. did not tell Amorette that defendant had touched her "vagina." Amorette did not "go into details. [she] just said down here, your area, your bottom, nobody is allowed to touch those places." If A.M. told Amorette that defendant touched her "privates," Amorette would know exactly what area she was talking about. Amorette did not know if she had ever told A.M. that a "private part" included any area covered by her underwear. When Amorette and Crystal went to the Round Lake Beach police station, defendant went along willingly.

¶ 22 During redirect examination, Amorette testified as follows. Defendant occasionally tickled A.M. but he did not tickle anyone else. Amorette never saw defendant pull down anyone's pants to tickle them.

¶ 23    Crystal, A.M.'s maternal grandmother, testified as follows.  While Crystal was on the phone with Amorette on the morning of March 8, 2015, Crystal heard A.M. tell Amorette that it hurt to "pee."  Crystal also heard A.M. say that defendant had "scratched her down there."  Crystal went to Amorette's house and initially talked to A.M. in Amorette's car in the driveway of the house.  A.M. said that defendant had "put his finger [*sic*] and scratched her in her private parts."  A.M. also said that defendant "was playing with me but then he put his finger in me and scratched me."  Crystal testified that A.M. was "adamant" that it happened and it hurt her.

¶ 24    After the conversation in the car, Amorette, Crystal, and A.M. went into the house and A.M. confronted defendant regarding her assertion that he had scratched her "down there" and it hurt her.  Defendant said that he was sorry and had not meant to do so, and A.M. replied, "no, you did it, you knew what you were doing."  After that discussion Jasmin talked to A.M. and took A.M. to Crystal's house while Crystal, defendant, and Amorette went to the police station.

¶ 25    During cross-examination Crystal testified as follows.  On March 8, 2015, A.M. did not use the word "vagina" while speaking with Crystal.  A.M. knew the word "vagina," but she chose to call it her "private."

¶ 26    Chenel Vandenberk, a trained sexual assault nurse examiner at Condell Medical Center in Libertyville, testified as follows.  Vandenberk is a registered nurse trained to treat and examine and collect evidence for patients presenting with sexual assaults.  She examined A.M. on March 8, 2015.  Vandenberk asked A.M. if anything hurt or was bothering her, and A.M. told her that "It hurt when she peed and also that her tummy hurt, and then she said but it tickled and maybe because [she was] nervous."  When Vandenberk examined A.M.'s genitalia, she saw abrasions on A.M.'s "urethral meatus and labia minora."  Vandenberk also saw "tears on what's called her posterior fourchette, which is at the lower part of the opening [of the genitalia]."  A.M. also had

scratches on her inner right thigh. Vandenberk marked the tears on a diagram and took photographs of A.M.'s injuries; these exhibits were admitted into evidence.

¶ 27    During cross-examination, Vandenberk testified as follows. A.M.'s injuries were consistent with tearing that could occur from fingernails and generally inconsistent with "wiping themselves." Later, when defense counsel asked if A.M.'s injuries were "consistent with a young person who could have been wiping their own genitalia," Vandenberk replied that it "could be consistent." Vandenberk testified that A.M.'s fingernails were "very, very short, if nonexistent." Vandenberk did not do an internal exam of A.M.'s vaginal canal because of the nature of a child's skin tissue and "speculums that they make aren't small enough to accommodate the opening." Vandenberk took swabs of A.M.'s vaginal area so that investigators could test them for D.N.A. Vandenberk testified that D.N.A. is not usually left on tissue from a fingernail inserted in a vagina.

¶ 28    Lynn Aladeen, a forensic interviewer at the Lake County Child Advocacy Center (Advocacy Center), testified as follows. On March 12, 2015, Aladeen interviewed A.M. at the Advocacy Center. A.M. told Aladeen that defendant pulled down her underpants, "dug his fingers into her private," scratched her "private," and that when she went to the bathroom, it burned. Based on Aladeen's experience, the context of the interview, and the hospital examination results, which revealed scratches on A.M.'s vagina, Aladeen interpreted "private" to mean "vagina." Aladeen's interview with A.M. was recorded. The recording was admitted into evidence and played for the court.

¶ 29    During cross-examination, Aladeen testified as follows. Aladeen did not ask A.M. what she meant by "private parts." Aladeen testified that A.M. told her that defendant put his finger "inside my private area." But A.M. did not describe what she meant by "private area." Aladeen assumed, based on all the information she had, that "private" meant "vagina," although A.M. did

not use the word "vagina." A.M. told Aladeen that defendant did not tickle her thighs. A.M. told Aladeen that defendant did "grown up stuff" to her and this meant that defendant stuck his finger in her private part. A.M. complained of pain on the right side of her body and she said that she felt the scratch in her genital area near the right side. A.M. did not tell Aladeen that she was scratched on the left side of her body. When asked whether A.M. told Aladeen that, during the March 8 incident, A.M. "was kind of sleeping," Aladeen replied, "[c]orrect." Aladeen does not use dolls to have children show her where they had been inappropriately touched because "some people" in her field believe the use of dolls is "suggestive." Aladeen was not aware that Jasmin used a Teddy bear as a doll.

¶ 30 Detective Gardiner Wade of the Round Lake Beach police department testified as follows. On March 8, 2015, he interviewed defendant at the police department. The interview was audio and video recorded. The video/audio recording was admitted into evidence and played for the court. The court further admitted a transcript of the recorded interview. Defendant also prepared a written statement, which was admitted into evidence. Wade testified that defendant denied that he inserted his finger into A.M.'s vagina, but defendant said that he touched A.M.'s vagina after pulling her pants down to "tickle" her. At the beginning of the interview, Wade informed defendant of his *Miranda* rights and defendant stated that he understood. Defendant also signed a form listing his Miranda rights, indicating that he understood these rights, and voluntarily agreed to answer questions.

¶ 31 During the interview the following colloquy occurred:

"Wade: You remember your hand going in her underwear?

[Defendant]: Yeah, that's what I'm saying. I was in there, I'm not trying to make nothing up. I was in there but I was playing with her, you know tickling her and everything.

* * *

Wade: Ok. So it's possible all this going on, you tickling her that your finger got in her vagina and scratched her.

[Defendant]: Yeah, possibly, that's what I'm saying.

* * *

Wade: So is it possible this morning that maybe your finger was down there a few seconds too long to maybe where it made her think that? That you were trying to scratch her?

[Defendant]: Mhm.

Wade: Is that possible?

[Defendant]: Maybe.

* * *

Wade: Ok, alright. So how long do you think your finger was like right on her, would have been on her vagina?

[Defendant]: Well, I wouldn't put it right there.

Wade: No I know, but when you felt it, how long was it on there? Like how many seconds?

[Defendant]: Like two seconds.

Wade: Like two seconds? Ok.

[Defendant]: And then I was done.

Wade: The bed. Ok. So you start tickling her and you think it maybe went on for like ten minutes of tickling?

[Defendant]: Probably.

Wade:  Ok, at what point during that did you put your hands down her underwear?

[Defendant]:  Um, probably five minutes after that.

* * *

Wade: Ok, alright.  But you did, you did put your hands down her underwear, though.

[Defendant]:  Yeah.

Wade:  Ok, I mean you're saying that happened.  You probably had your finger down there for like near her [inaudible]?

[Defendant]:  Maybe a little too long.

Wade:  Like by her vagina for a couple of seconds.

[Defendant]:  Probably like in that area.  Yeah.

Wade:  Ok.

[Defendant]:  I'm not going to deny it.  That's what happened.  I maybe scratched her.  That's why her pee is burning.

Wade:  Ok.

[Defendant]:  That's why her pee is burning.

Wade:  Ok, so it makes sense if she says that her vagina hurts because she would have been[,] could have been scratched on her vagina by you.

[Defendant]:  Exactly what I'm saying.

Wade:  ok.

[Defendant]:  I accidentally scratched her on top of something.  But I never did put my finger in her, no.

Wade:  Ok, it would have been on the outside then?

[Defendant]: Yes.

* * *

Wade: Okay, so when when [*sic*] she says your finger went down on her vagina in that area, um, she didn't say how long. She said it could have just been a second that your finger went inside. Do you remember how deep inside? Was it maybe just a little bit?

[Defendant]: I don't …that's what I'm saying. Had my finger went up there, she would have been scratched on her inside. That's what I'm saying. The only way her pee is going to burn is if it comes out.

Wade: Right, but if…usually when the pee burns, that indicates that's a scratch on the inside most times. That's primarily how it is. So is it possible you finger went in just, maybe just a little bit and you weren't even…

[Defendant]: I don't even know. That's what I'm saying. Possibly. I don't know.

Wade: Okay, right. 'Cause you know your finger went down there.

[Defendant]: Yeah, but I know I'm not intentionally putting my finger in there.

Wade: Okay, she, but you put your finger down there to tickle her.

[Defendant]: Yeah. 'Cause I'm right up in this area.

Wade: Okay. She, she's saying your finger went inside, just, not like all the way. But a little, at least a little bit inside for like maybe a second. So, is that possible that you put your finger possibly Inside her for a second?

[Defendant]: Possibly, I don't know."

¶ 32 Mary W., defendant's mother, testified on defendant's behalf as follows. Mary received a phone call from defendant during the morning of March 8, 2015. The call lasted an hour or two. Mary knew Crystal and was familiar with her voice. During the call, Mary heard Crystal's "loud"

voice in the background. Mary also spoke to A.M. during the phone call. Mary asked A.M. what was "going on" that morning. When defense counsel asked how A.M. responded, the State objected.

¶ 33    The court then heard argument regarding the objection. Defense counsel argued that what A.M. said to Mary was admissible as "impeachment" specifically to impeach A.M.'s "115-10 statement." Defense counsel noted that during the hearing on the State's motion to admit the section 115-10 statements, Mary testified that A.M. told her "Nothing happened, grandma, [defendant] was just tickling me." The State argued that A.M. could not be impeached with her alleged statement to Mary because defense counsel never confronted A.M. with that statement. The court ruled that A.M.'s statement to Mary could not be used to impeach A.M, stating, "[A.M.] said she didn't remember talking to grandma [Mary]. We still have to follow the rules of evidence."

¶ 34    Defendant testified as follows. He was 28-years old at the time of the trial. Defendant denied that he "sexually touched" A.M. He had no recollection of what happened during the morning of March 8, 2015, because he was asleep. Defendant testified that at some point he tickled A.M. and he "must have been playing with her." He repeatedly told Wade that "it was all an accident" but Wade kept "drilling" him and telling him, "you know you did this." Crystal kept telling defendant that he "did something" to A.M. Defendant testified that he "only agreed with [Wade] because that's what he kept telling me, that [Wade] was getting it from Crystal and that's what she was telling me the whole day, like for three hours. I didn't even know what happened." Defendant told Wade that it was "possible" that his finger had gone into A.M.'s vagina because Crystal told him that and because he "didn't know" and he was "trying to figure out everything." Defendant also told Wade that he "possibly" scratched A.M.'s vagina because he had long

fingernails. Defendant denied that he "knowingly" put his finger into A.M.'s vagina or that he accidentally made contact with her vagina. Defendant reiterated that he was asleep. Defendant told Wade that "maybe" he pulled down A.M.'s pajama's or underwear, that he did not actually do these things, or that he did them unintentionally, as he was asleep.

¶ 35    The trial court found defendant guilty of two counts of predatory criminal sexual assault and two counts of aggravated criminal sexual abuse, counts one through four of the indictment alleging the offenses committed against A.M. on March 8, 2015.

¶ 36    On April 11, 2017, defendant filed a motion for a new trial. On May 4, 2017 the trial court denied defendant's posttrial motion. On that same date, the court merged defendant's convictions and sentenced defendant to nine years' imprisonment for his conviction for predatory criminal sexual assault of a child (count one). On May 12, 2017, defendant filed a motion for a new sentencing hearing, which the trial court denied the same day. Defendant filed his initial notice of appeal on that same date. On May 31, 2017, defendant filed an amended notice of appeal.

¶ 37                                    II. ANALYSIS

¶ 38    Defendant argues that the trial court erred by refusing to consider Mary W.'s testimony as impeachment of A.M.'s allegations. However, defendant failed to raise this issue in his posttrial motion and, therefore, forfeiture applies. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (objection both at trial and in a posttrial motion is required to preserve an issue for appeal). Defendant concedes that the issue was not preserved but asks this court to review it as plain error.

¶ 39    The plain-error doctrine permits appellate review of a clear or obvious unpreserved error when (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) when the error was so serious as to threaten the integrity of the judicial process, regardless of the closeness of the

evidence. (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. The initial step in any plain-error analysis is to determine whether there was a clear or obvious error. *Id.*, ¶ 49.

¶ 40 The admission of evidence lies within the discretion of the trial court, and we review the trial court's decision to admit evidence for an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The general rule is that hearsay, defined as "an out-of-court statement * * * offered to prove the truth of the matter asserted," is inadmissible at trial. (Internal quotation marks omitted.) *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). There is an exception to the hearsay rule for prior inconsistent statements of a testifying witness, which may be admitted to impeach the witness's credibility. *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 38. Under Illinois Rule of Evidence 613(b), before a witness can be impeached with extrinsic evidence of a prior inconsistent statement, a proper foundation must be laid by affording the witness an opportunity to explain or deny it, and the opposing party is afforded an opportunity to interrogate the witness about the statement. Ill. R. Evid. 613(b) (eff. Sept. 17, 2019) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is first afforded an opportunity to explain or deny the same and the opposing party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."). A proper foundation includes directing the witness toward the time, place, and circumstances of the statement, including the person to whom it was made, as well as to the substance of the statement. *People v. Cobb*, 97 Ill. 2d 465, 479 (1983); *People v. Cook*, 2018 IL App (1st) 142134 ¶ 55. The witness then must have the opportunity to explain the inconsistency. *People v. Cook*, 2018 IL App (1st) 142134 ¶ 55. The purpose of laying the proper foundation for impeachment by admission of a prior inconsistent statement is to protect a witness against unfair surprise and to provide the witness with

an opportunity to explain the statement with which he is confronted. *People v. Henry*, 47 Ill. 2d 312, 321 (1970).

¶ 41 Here, defendant intended to impeach A.M. with Grandma Mary's testimony that A.M. told her on the phone that "Nothing happened, grandma. [And defendant] was just tickling me." However, defendant failed to lay a proper foundation for A.M.'s purported prior inconsistent statements. During cross-examination of A.M., defense counsel asked A.M. if she recalled speaking on the phone with Mary on the morning of the incident and A.M. replied that she did not remember. But defense counsel failed to direct A.M. to the substance of her alleged inconsistent statement. Therefore, A.M. was not afforded an opportunity to explain or deny the alleged inconsistent statements and the State was not provided an opportunity to interrogate A.M. about the alleged inconsistent statement on re-direct examination. Accordingly, the trial court did not abuse its discretion by refusing to admit Mary's testimony regarding A.M.'s inconsistent statements. Accordingly, no error occurred.

¶ 42 Defendant cites *Henry*, 47 Ill.2d 312, to support his argument. In *Henry*, the witness, who the defendant sought to impeach, denied and then later claimed that she did not remember having a conversation with her aunt or others concerning her police statement. *Id*. at 319. During cross-examination, the witness was alerted to the substance of the remark and to the identity of the people to whom it was allegedly made. *Id*. at 319. Witnesses were then called who would testify that such conversation did occur in which this witness told them that she gave the statement only after she had been allegedly coerced by the police. *Id*. at 320. The trial court sustained objections to the introduction of this testimony. *Id*. at 320. Our supreme court explained:

"The rationale of requiring a foundation is to protect the witness against unfair surprise and to permit his explanation of the prior statement. We believe the questions propounded on

cross-examination did substantially satisfy the reasons for the rule requiring a foundation."

*Id*. at 322.

Here, defense counsel asked A.M. only if she recalled speaking on the phone with Mary on the morning of the incident. Defense counsel never alerted A.M. to the substance of the alleged inconsistent remark or even that there was a conversation. In contrast to *Henry*, "the foundation in this case was too general and inadequate." *People v. Smith*, 78 Ill. 2d 298, 305 (1980). Therefore, *Henry* is distinguishable from this case.

¶ 43 Defendant argues that his case was closely balanced. We need not address this issue because we have determined that no error occurred. See *Sebby*, 2017 IL 119445, ¶ 48. However, we note that the evidence against defendant was not closely balanced. A.M. testified that when she was seven-years old, on March 8,, 2015, she was in bed with her mother and defendant, and defendant pulled her underpants down, "took his fingernail and touched [her] in [her] private part." A.M. testified that her "private part" is her "vagina." She also testified that defendant "took his fingernail and touched [her] "vagina." A.M. testified that defendant "put it in and did like this [indicating a circling movement]." Defendant's finger was "in the inside," and "it hurt a lot."

¶ 44 Further, A.M.'s testimony was corroborated by Vandenberk who examined A.M. on the date of the incident and testified that A.M. had abrasions and tears on her genitalia and that these injuries could occur from fingernails. In addition, defendant told detective Wade that he touched A.M.'s vagina and that it was possible that his finger went inside and scratched A.M. vagina. Defendant also testified that his fingernails were long.

¶ 45 Defendant notes minor inconstancies in A.M.'s testimony and conflicts between A.M.'s testimony and the testimony of other witnesses. But none of the inconsistencies and conflicts places doubt on the substantial evidence against defendant. The testimony of the complaining

witness need not be uncontradicted, unimpeached, crystal clear, or perfect in order to be considered sufficient. *Id*. Inconsistencies or shortcomings in the victim's testimony will ordinarily present a question of credibility for the trier of fact to resolve. *Id*.

¶ 46                                  III. CONCLUSION

¶ 47     For the reasons stated, we affirm the trial court's judgment.

¶ 48     Affirmed.