# Illinois Official Reports

## Appellate Court

***People v. Darr*, 2018 IL App (3d) 150562**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID C. DARR, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0562 |
| Filed<br>Rehearing denied | January 10, 2018<br>February 6, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 14-CF-153; the Hon. Paul P. Gilfillan, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part.<br>Remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Dimitri Golfis, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Stewart J. Umholtz, State's Attorney, of Pekin (Patrick Delfino, Lawrence M. Bauer, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices Holdridge and Wright concurred in the judgment and opinion.


## OPINION

¶ 1       Defendant, David C. Darr, appeals following his conviction on three counts of predatory criminal sexual assault of a child and two counts of criminal sexual assault. He argues that an accumulation of errors resulted in a fundamentally unfair trial and requests that this court vacate his convictions and remand for a new trial. Alternatively, defendant argues that his *pro se* posttrial claims of ineffective assistance of counsel warranted a preliminary *Krankel* inquiry, which the circuit court failed to conduct. Finally, defendant argues that the circuit court erred in imposing the public defender fee without first conducting the requisite hearing on defendant's financial circumstances. We affirm defendant's convictions and sentence and vacate the public defender fee.

¶ 2                                        FACTS

¶ 3       In a bill of indictment filed April 17, 2014, the State charged defendant with three counts of predatory criminal sexual assault of a child (counts I to III) (720 ILCS 5/11-1.40(a)(1) (West 2014)) and three counts of criminal sexual assault (*id.* § 11-1.20(a)(3)).[1] Counts I to III referenced events occurring between December 29, 2006, and December 28, 2012. Count I alleged that defendant knowingly made contact with the vagina of C.J. with his penis. Count II alleged defendant knowingly made contact with the vagina of C.J. with his fingers. Count III alleged defendant knowingly made contact with the mouth of C.J. with his penis.

¶ 4       Prior to trial, the State filed a motion to admit other-crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2014)). Specifically, the State sought to introduce evidence of defendant's prior conviction for predatory criminal sexual assault of a child committed in 1996. In addition to the certified conviction, the evidence would include the testimony of the victim in that case, J.M.; testimony of Dennis Minton, to whom defendant admitted J.M.'s allegations were true; a written admission by defendant; and a letter written by defendant to the prosecutor in that case further admitting to the offense. The State later orally amended its motion to include testimony from J.S., who would testify that defendant had sexual contact with her when she was seven or eight years old. The court granted the State's motion.

¶ 5       The evidence at trial established that C.J. was born on December 29, 1999. C.J.'s mother is Colleen R. Colleen's two sisters (C.J.'s aunts) are Sondra B. and Karen O. In addition to C.J., Colleen has two other daughters and one son. One of the other daughters is defendant's biological child. Colleen and defendant entered into a relationship in 2002 or 2003. Approximately three years later, defendant moved in with Colleen in a house located on North Main Street in North Pekin. Colleen's four children, including C.J., also lived at the house.

---

[1]The State dropped the third count of criminal sexual assault prior to the commencement of defendant's trial.

Defendant's two older daughters from a different relationship—Kayla and Erica—would live periodically at the house.

¶ 6 The evidence further established that defendant was born on February 3, 1967. Prior to his relationship with Colleen, defendant was married to Delta V. (also known as Delta Darr). Delta was the cousin of Colleen, Sondra, and Karen. It was through Delta's marriage that the sisters originally knew defendant. Delta has two nieces, J.M. and J.S., who were born in 1984 and 1986, respectively.

¶ 7 Sondra testified that she had a close relationship with C.J. Sondra lived in Missouri until C.J. was approximately 12 years old, and C.J. would often visit for weeks at a time. When Sondra moved back to North Pekin, C.J. and her sisters would often spend weekends at Sondra's home. Sondra testified that C.J. had always been an outgoing child and was "happy-go-lucky." When C.J. was 12 years old, however, Sondra began to notice a change in C.J.'s personality. She noticed that C.J. did not like to be around any adults and did not like to play with other children. She preferred to be alone. Sondra described C.J. as becoming "very withdrawn."

¶ 8 Toward the end of March 2014, C.J. stayed at Sondra's house during her spring break. March 30 was a Sunday; C.J. was to return to school the next day. Though the plan had been for C.J. to return home that evening, she asked Sondra if she could spend the night and have Sondra drive her to school in the morning. Sondra called Colleen, but Colleen decided that C.J. needed to come home to get ready for school. Sondra testified that she repeatedly told C.J. to get ready to return home, but C.J. continued to procrastinate.

¶ 9 C.J. eventually went to the front porch of Sondra's home, where Sondra's sister-in-law, Sherry H., was sitting. Sondra testified that C.J. had been on the porch with Sherry for approximately five minutes when the two came back into the house, C.J. crying. Sondra had never seen C.J. that upset. Sherry told Sondra that they needed to speak privately, so they went to the basement with C.J. Sondra testified that she asked C.J. what was wrong, and that C.J. responded, "Aunt Sondra, I'm scared, I don't want to go home. [Defendant is] messing with me."

¶ 10 At this point, defense counsel objected on hearsay grounds. The State responded, "it's [offered] for the effect on the listener and what she did in response to it. [C.J.] will testify to all of this." The court sustained the objection in part, stating:

"With regard to the hearsay objection, the jury will be instructed, just as they were moments ago, any claimed statement by [C.J.] at this point in time is not to be taken by you as the truth of the matter that that occurred for what she said. Rather, that statement is coming in for the limited purpose of showing what impact it had on this witness here.

As counsel indicated and as other counsel has as well, [C.J.] will be testifying on first hand information allegations later."

¶ 11 Sondra reiterated that C.J. told her that defendant "was messing with her." They talked in the basement for approximately 25 to 30 minutes. C.J. pleaded to not be taken home. Sherry called Karen, who then came to Sondra's house. Karen, Sondra, Sherry, and C.J. went to the North Pekin Police Department.

¶ 12 Michael Sea of the North Pekin Police Department testified that he was off duty on the night of March 30, 2014. Around 10 p.m., he received a phone call from Karen, who was a friend of Sea's wife. Sea testified, "Karen called me and stated that her niece [C.J.] had ***

- 3 -

talked to her and stated that she had been molested." He clarified that Karen had specifically told him that C.J. said defendant had molested her. Sea knew C.J. because she was of similar age to his own daughters and had been to his house several times. He also knew defendant. Sea called Bryon Martin, also of the North Pekin Police Department, because Sea knew Martin was familiar with the family.

¶ 13    Sea went to the police station at approximately 10:15 p.m. He noticed that C.J. was upset and crying or, as he put it, "not her normal self." Sea remained at the police station while Martin spoke with C.J., but Sea himself was not formally a part of the investigation. He testified that an agent of the Department of Child and Family Services (DCFS) came to the station and established a safety plan, which included removing C.J. from her home.

¶ 14    Martin testified that he was at home on the night of March 30, 2014, when he received a telephone call from Sea. Regarding that phone call, Martin testified, "He told me that [C.J.] was ready to talk about [defendant] touching her." Martin arrived at the police station around 10:15 p.m., where he noticed that C.J. was visibly upset. Martin spoke with Karen, Sherry, Sondra, and C.J. Martin testified that his conversation with C.J. was brief because after she made an allegation of sexual abuse he terminated the interview and arranged for a child advocacy center (CAC) interview.

¶ 15    Martin testified that Colleen eventually arrived at the station. Martin informed her that C.J. had made an allegation of sexual abuse against defendant. He testified that Colleen had no emotional reaction to the news. Martin explained that under the DCFS safety plan, Colleen's three daughters would go to Karen's house and Colleen's son would go to Sondra's house.

¶ 16    On April 4, 2014, Jeff Jackson of the North Pekin Police Department arrested defendant. Jackson informed defendant that he was being charged with predatory criminal sexual assault. Martin was present for the arrest and defendant's subsequent transport. Martin testified that no questions were asked of defendant while he was in the squad car, but defendant did enquire as to "why it was predatory." When Martin explained that the charge was "based upon the timeline," defendant "said something about her being over 13."

¶ 17    C.J. testified that she lived in the home on North Main street in North Pekin with Colleen and defendant for approximately 11 years. She testified that on the night of March 30, 2014, she told Sondra that defendant had molested her. Soon thereafter, Karen arrived at Sondra's house, and they all went to the police station. At the police station, C.J. told officers "that over the past couple of years, [defendant] had been coming in my room. He's been asking me to do things and everything else." C.J. did not go into full detail with the officers that night but went into more detail in the CAC interview conducted a few days later.

¶ 18    C.J. testified that her first encounter with defendant occurred at her mother's house. C.J. was in the bathroom and heard a knock on the door. She opened the door to find defendant standing before her. C.J. testified, "He just told me to back into the bathroom, and he took pictures of my butt." Further, she testified, "He had me lean over the toilet, and he pulled my pants down and took pictures of my butt." C.J. testified that she was "[l]ike 7, almost 8" years old when that happened.

¶ 19    C.J. immediately told Karen about the bathroom incident, and Karen took C.J. to Colleen. After C.J. told Colleen what had happened, Colleen and Karen spoke to each other privately. Later, a DCFS agent came to the home. C.J. testified that she told the DCFS agent what happened but stated that defendant had not touched her. She told the DCFS agent this because she did not want to be taken away from her mother.

¶ 20       Later, when C.J. was approximately eight years old, defendant began going into C.J.'s bedroom at night. C.J. explained, "He'd unbutton my pants and he'd stick his hands in my vagina." She clarified that defendant's finger or fingers went inside her vagina. C.J. testified that defendant's behavior was continuous from the time she was eight years old until she alerted authorities. She estimated it had occurred at least 100 times. Though C.J. shared a bedroom with her two younger sisters, she believed they were asleep during the encounters.

¶ 21       C.J. also testified that when she was 11 or 12 years old, she went to her mother's bedroom to retrieve cigarettes for her mother, and defendant followed her. She continued, "He came in and like closed the door like halfway and had me lay on my mom's bed and pulled down my shorts and he got on top of me and had sex with me." C.J. confirmed that defendant put his penis in her vagina and moved back and forth. She testified that this was not the first time defendant had put his penis in her vagina. He had done the same thing in her bedroom when she was nine years old.

¶ 22       C.J. recalled another incident as well:

> "[C.J.]: I was in the bathroom getting ready to go to bed, and he came in and had me sit on the toilet.
>
> [STATE]: About how old were you then?
>
> [C.J.]: 13 maybe, and he—
>
> [STATE]: Were you 13 or were you younger?
>
> [C.J.]: I might have been younger."

C.J. further explained that on that occasion, defendant placed his penis inside her mouth and moved it back and forth. He later told her to clean her mouth. On cross-examination, C.J. estimated she was "[l]ike 11 or 12" when the incident in the bathroom occurred.

¶ 23       C.J. testified that her mother had instituted a rule that none of the children in the house were to be alone with defendant. C.J. testified that she had been living with her father since she came forward, but she missed living with her mother. In the time that defendant was molesting her, C.J. did not tell anyone because she continued to fear that she would be taken from her mother.

¶ 24       Colleen testified that she continued to live on North Main Street in North Pekin and had lived there for more than 25 years. She testified that defendant moved into that home in 2005, when C.J. was five or six years old. When defendant moved in, Colleen established a rule that he would never babysit or be alone with the four children. The rule was crafted because Colleen knew defendant was a registered sex offender and also knew he had been convicted of an offense. Defendant's two daughters, Erica and Kayla, were now in their twenties and would occasionally stay at the house.

¶ 25       Colleen recalled the incident in which Karen told her that defendant had taken photographs of C.J.'s buttocks. Colleen confronted defendant the next day but did not find the pictures on his phone. Defendant continued to live at the house after the incident.

¶ 26       Colleen did not receive a telephone call on the night of March 30, 2014. After C.J. had not returned from Sondra's house for some time, Colleen and defendant got into a vehicle with the intent of finding her. Because her home is directly adjacent to the North Pekin police station, however, Colleen immediately noticed Karen's van in the police station parking lot. Before Colleen could head to the police station, defendant exited the vehicle. He told Colleen he was going to go to his sister's house because "he had a feeling something was wrong."

¶ 27    Karen testified that she had known C.J. since C.J.'s birth. Karen and C.J. had always had a close relationship, largely because C.J. spent so much time at Karen's house when she was growing up. Karen described C.J. as "[v]ery talkative, outgoing, [and] vibrant" when she was a young child. But as C.J. became older, she became more withdrawn and introverted. Karen began noticing these changes in C.J.'s personality when she was seven years old.

¶ 28    Karen recalled the incident in the bathroom at the North Main Street house to which C.J. had referred. Karen testified that she was at the house doing her laundry that evening. She eventually fell asleep in the front room of the house but woke up at approximately 5 a.m. Karen went toward the back of the house to use the bathroom, where she noticed defendant exiting the room. Defendant shut the bathroom door behind him and remained standing in front of it. When Karen told defendant she needed to use the bathroom, defendant told her C.J. was using it.

¶ 29    Defendant eventually relented, and Karen entered the bathroom. She saw C.J. crying. Karen testified, "She was really upset. She had said that [defendant] tried to take a picture of her bottom and told me that he pushed her on her back to have her bend over the toilet seat so he could take the picture." Defendant was wearing a black flip phone on his belt. Karen immediately took C.J. to Colleen's bedroom, where C.J. told her Colleen what had happened. When Colleen failed to notify the police, Karen did so. From that time forward, Karen saw significantly less of C.J. because Colleen did not want the children to see Karen with such regularity. Karen testified that she began seeing more of C.J. again in 2014.

¶ 30    On March 30, 2014, Karen received a telephone call from Sherry, Sondra's sister-in-law. Based on that telephone call, Karen called Sea, then she went to pick up C.J. from Sondra's house. When she arrived, she saw that C.J. was crying. Karen took C.J. to the police station, where they both spoke with the officers.

¶ 31    Dennis Minton of the North Pekin Police Department testified regarding an incident that occurred in 1996 and he investigated in 1998. Minton testified that he came to interview J.M., who told him that she had been home with defendant when defendant placed his mouth on her vagina then placed his penis in her vagina. The incident occurred when J.M. was 11 years old. Defendant was her uncle.

¶ 32    Minton subsequently went to defendant's home, where he was living with Delta, his wife at the time. Minton transported defendant from his home to the police station. Minton testified that during the ride "[defendant] asked me if this was about [J.M.], and I told him it was, and he said that he was glad that it was going to be over with." Minton eventually relayed J.M.'s accusations to defendant, and defendant told Minton "it was basically true." Minton testified that defendant explicitly admitted to having sexual intercourse with J.M. Defendant later provided a written confession, which was submitted into evidence at the present trial. Defendant was placed under arrest for predatory criminal sexual assault of a child and ultimately pled guilty.

¶ 33    J.S., J.M.'s sister, testified that when she was 10 or 11 years old, her aunt Delta was married to defendant. Around that time, J.S. recalled an incident that occurred while she was at Delta's house. She testified, "I remember being in a doorway and having [defendant] pull my pants down and licking me in my vagina." Referring to a separate incident, J.S. testified, "[T]here was a time after that that we were laying in bed and he had me touch his penis." In April 2014, shortly after defendant had been arrested, J.S. saw defendant while she was at

Erica's house. Defendant told her that if she was confronted by detectives, she should tell them she did not know anything.

¶ 34 Erica, defendant's daughter, testified for the defense. She stated that defendant was diligent about following the rule against his being alone with the children. Erica testified that when she stayed at the house on North Main Street, she either slept in the young girls' bedroom or on the couch. She would frequently stay awake until the early morning hours. She never saw defendant get up in the middle of the night.

¶ 35 At the close of proofs, the parties engaged in closing arguments. In its argument, the State pointed out that the victim must be "under 13 years of age when the act was committed" in order to sustain a conviction for predatory criminal sexual assault. With regard to count III, the State argued "[C.J.] told you she was 11 or 12 years old she thought." In his responsive argument, defense counsel pointed out that C.J. originally testified that she was 13 when that incident took place or, alternatively, that she was unsure of her exact age.

¶ 36 Later, in the State's rebuttal argument, the State declared:

"It is unfortunate that [C.J.], a girl who, when she sat here yesterday, a 15-year-old teenager, I submit was quite different when she was six, seven, eight years old. You put your eyes in the eyes of a young child and imagine, as she told us, imagine what it was like to be subjected to the actions that she was subjected to.

How was she able to survive that? *** [T]he evidence shows, that she survived it by keeping her mouth shut because—and maybe it's not understandable to some people, I submit respectfully it is understandable from her seven, eight, nine-year-old mind, the most important thing was to keep her family together, stay with her mother.

You saw her mother. The evidence shows that she will not win mother of the year by any stretch of the imagination. But to [C.J.], that was her only mother and she didn't want to be taken away from her. And now, because of this man's actions, she is away from her mother."

The State further addressed in its rebuttal argument C.J.'s age during the incident alleged in count III. The State argued:

"[Defense] [c]ounsel talked about Count 3 and he said that [C.J.] said, well, that happened when I was 13. He is right. When I, of course, asked that question, she said that she thought she was 13. And I then asked her well, were you actually younger than that? She says well 12[.] [B]ut the evidence shows that when she was asked by counsel on cross-examination, she said, no, that happened when I was 11 or 12 in response to his [question]. And that was her answer that she never changed."

¶ 37 Following arguments, the court delivered instructions to the jury. In delivering those instructions, the court stated, "A person commits the offense of predatory criminal sexual assault of a child when he knowingly commits an act of sexual penetration when he is 17 years of age or older and the victim is 13 years of age or under when the act was committed." Immediately thereafter, the court read the elements of the offense with respect to count I, including, "And third proposition, that C.J. was under 13 years of age when the act was committed." Before proceeding to the elements of count II, the court stated:

"I am just going to read the definition of predatory criminal sexual assault of a child once more. And that's when a person knowingly commits an act of sexual penetration

when he is 17 years of age or older and the victim is under 13 years of age when the act was committed."

The court then read the elements that needed to be proven on each of the remaining counts. In reciting the propositions for count II and count III, the court stated on each occasion that the State must prove C.J. was "under 13 years of age when the act was committed."

¶ 38 The written instructions provided to the jury also indicated, with respect to each of the first three counts, that the State was obligated to prove C.J. was under 13 years old. In sum, the phrase "under 13 years of age" appears four separate times within the written instructions.

¶ 39 The jury found defendant guilty on all counts.

¶ 40 On August 7, 2015, defendant filed a motion for judgment notwithstanding the verdict and for a new trial. The circuit court denied the motion the same day. The court then sentenced defendant to life sentences on each of the three counts of predatory criminal sexual assault of a child and 20-year sentences of imprisonment on each of the criminal sexual assault counts. All sentences would be served consecutively. At the end of the sentencing hearing, defense counsel raised the issue of the public defender fee. Counsel then discussed with the court his hours and the amount of defendant's posted bond. The court ordered defendant to pay a $750 public defender fee, which appeared with the imposed sentences on the written judgment order.

¶ 41 The common law record contains a fully handwritten document prepared *pro se* by defendant, bearing a Tazewell County clerk file stamp of August 7, 2015. The top of the document reads "In the Appeallate [*sic*] Court of Illinois," while the caption reads, in part, "Appeal from the circuit court of the Tazewell County." The heading directly beneath the caption reads, "I David C. Darr comes [*sic*] to you in this appeal with the request of a new trail [*sic*] on the grounds of ineffective counsel." Throughout the document, defendant lists a number of grievances he had with defense counsel. The document was never addressed in court. The final page of the *pro se* document is defendant's notice of appeal.

¶ 42                                    ANALYSIS

¶ 43 Defendant raises a number of issues on appeal. First, he contends that a number of errors at his trial had the cumulative effect of depriving him of his due process right to a fair trial. Separately, he argues that the circuit court erred in failing to conduct a preliminary *Krankel* inquiry into the *pro se* claims of ineffective assistance of counsel he made in his August 7, 2015, filing. Finally, defendant contends the circuit court erred in imposing the public defender fee without first conducting a hearing on defendant's financial circumstances or ability to pay.

¶ 44                              I. Cumulative Error

¶ 45 Defendant has identified a total of eight alleged errors that he claims had the cumulative effect of depriving him of a fair trial. Those eight errors may be grouped into four broader categories: (1) hearsay statements, (2) violation of the confrontation clause, (3) prosecutorial misconduct in closing arguments, and (4) legally erroneous jury instructions. We will further detail defendant's contentions of error in the corresponding sections below.

¶ 46 At the outset, defendant acknowledges that he failed to preserve for review each of the alleged errors. Defendant briefly argues, without citation to authority, that "[w]hether each of the individual errors has been forfeited is irrelevant to a cumulative-error claim." Defendant

also asserts that "the State has not argued that [defendant's] cumulative-error claim is forfeited." We reject defendant's position. We are aware of no authority—and defendant has cited no such authority—to support the contention that, by combining multiple unpreserved, forfeited errors, a defendant may transform his claim into one that is preserved or not forfeited.

¶ 47    Alternatively, defendant argues that this court address his argument under the rubric of plain error. The doctrine of plain error provides a limited exception to the general rule of forfeiture. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). The first step in any plain error analysis is to determine whether a clear or obvious error occurred. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 48    If a reviewing court determines that a clear or obvious error occurred at the trial level, the burden is placed on the defendant to demonstrate that the error was prejudicial. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). This differs markedly from ordinary review of preserved errors, in which, upon the finding of error, it is the State's burden to prove that the error was not prejudicial, and was therefore harmless. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009) ("[W]here the defendant has made a timely objection and properly preserved an error for review, the reviewing court conducts a harmless-error analysis in which the State has the burden of persuasion with respect to prejudice. [Citation.] However, where the defendant fails to make a timely objection and therefore forfeits review, the reviewing court will examine the record only for plain error. In a plain-error review, the burden of persuasion remains on the defendant.").

¶ 49    In plain-error review, the defendant may demonstrate prejudice in one of two ways. First, under what is commonly known as first-prong plain error, a defendant may demonstrate that the evidence at trial was so closely balanced that the error in question threatened to impact the result of the trial. *People v. Sebby*, 2017 IL 119445, ¶ 51. The showing of prejudice under the first prong has often been referred to as a showing that the error was " 'actually prejudicial.' " *Id.* (quoting *Herron*, 215 Ill. 2d at 193)).[2]

¶ 50    Under what has come to be known as the second prong of plain error, a defendant may show that an error is so grave that prejudice must be presumed, regardless of how closely balanced the evidence was at trial. *Id.* ¶ 50. To show that an error is reversible under the second prong, a defendant must demonstrate that the error "was so serious it affected the fairness of the trial and challenged the integrity of the judicial process." *Id.*

¶ 51    In the present case, defendant does not argue that the errors raised are actually prejudicial under the first prong. Instead, defendant contends that the accumulation of errors resulted in a fundamentally unfair trial, warranting reversal under the second prong. Notably, defendant does not claim that any of the errors alleged had the individual effect of depriving him of a fair trial. Thus, our analysis must proceed as follows. First, we must determine which of the eight alleged errors actually constitute "clear or obvious" errors. *Piatkowski*, 225 Ill. 2d at 565. Then, we must determine whether the cumulative impact of those errors "affected the fairness

---

[2]Our supreme court has recognized that the term "actual prejudice" does not imply that there must be a direct showing that an error specifically impacted the decision of a fact finder. Instead it refers to a higher *likelihood* that such was the case. As the court put it, "The defendant need not prove that the error in the instruction actually misled the jury. *** We deal with probabilities, not certainties; we deal with risks and threats to the defendant's rights. When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person." *Herron*, 215 Ill. 2d at 193.

of the trial and challenged the integrity of the judicial process." *Sebby*, 2017 IL 119445, ¶ 50.

¶ 52                            A. Hearsay Statements

¶ 53     The Illinois Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Hearsay is generally inadmissible, except in those circumstances in which the rules of evidence dictate otherwise. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Under the definition provided in Illinois Rule of Evidence 801(c), it is axiomatic that an out-of-court statement that is offered into evidence for reasons *other* than to prove the truth of the matter asserted is not hearsay. See Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). One common admissible purpose for which such statements may be offered is to show the effect of the statement on the listener. *E.g.*, *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008) ("an out-of-court statement offered to prove its effect on a listener's mind or to show why the listener subsequently acted as he did is not hearsay and is admissible"). Illinois Rule of Evidence 105 dictates that when certain evidence is admissible "for one purpose but not admissible *** for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper purpose or scope and instruct the jury accordingly." Ill. R. Evid. 105 (eff. Jan. 1, 2011).

¶ 54     Defendant has identified three statements[3] from witnesses at his trial that he characterizes as inadmissible hearsay, the admission of which he claims constituted error. First, Sea testified that Karen told him that C.J. told Karen defendant had molested C.J. Second, Martin testified that Sea told him C.J. was "ready to talk" about defendant molesting her. Third, Karen testified that C.J. told her defendant had pushed on her back to make her bend over the toilet seat so defendant could take a photograph of her buttocks.

¶ 55     To be sure, each of the statements identified by defendant refer to statements made by persons other than the person testifying. However, in each instance, the statements were offered for reasons other than the truth of the matter asserted. Specifically, the person testifying was explaining the effect the statement had on him or her, that is, how the statement moved the testifying party from point A to point B.

¶ 56     For example, Sea's testimony that Karen told him C.J. told her defendant molested her was not offered to prove that defendant molested C.J., but as part of a narrative showing why Sea called Martin and commenced an investigation. Martin's testimony regarding his conversation with Sea was offered for the same reason, to show how Martin got from his home to the police station and interviewed C.J. Karen's testimony regarding C.J.'s accusation that defendant had taken photographs of her buttocks was offered not to prove that the incident happened, but to show why Karen confronted Colleen and subsequently fell out of major contact with C.J. in the years in which defendant committed his crimes.

¶ 57     Perhaps more obviously, C.J.'s statement to Karen, to which Karen testified, is a clear example of an excited utterance. Illinois Rule of Evidence 803(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of

---

[3]Defendant technically claims that a fourth statement—Minton's testimony regarding what J.M. said to him—also constituted inadmissible hearsay. However, he also argues that the same testimony was a violation of the confrontation clause. Accordingly, we will address defendant's entire argument relating to Minton's testimony in subsection B.

excitement caused by the event or condition" is not excluded by the hearsay rule. Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). "For the excited utterance exception to the hearsay rule to apply, 'there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, there must be an absence of time for the declarant to fabricate the statement, and the statement must relate to the circumstances of the occurrence.' " *People v. Connolly*, 406 Ill. App. 3d 1022, 1025 (2011) (quoting *People v. Sutton*, 233 Ill. 2d 89, 107 (2009)). Here there can be no doubt that the incident in question was sufficiently startling, and Karen testified that she entered the bathroom immediately after defendant left, while C.J. was still in tears.

¶ 58     Defendant points out that the circuit court did not explicitly limit the admission of those particular statements to the purposes listed above. While discussing his fourth claim of hearsay (see *supra* ¶ 54 n.3), defendant asserts:

> "Given that the jury was never instructed that this testimony was admitted for a limited purpose, it cannot be said that the testimony was only admitted for that purpose. Because the jury was not given such an instruction, it cannot be assumed that the jury did not consider J.M.'s out-of-court statement for the truth of the matter asserted."

¶ 59     We wholly reject defendant's position. Illinois Rule of Evidence 105 makes clear that the onus is on the party seeking limited admission to request an instruction to that effect. Ill. R. Evid. 105 (eff. Jan. 1, 2011) ("[T]he court, *upon request*, shall restrict the evidence to its proper purpose or scope and instruct the jury accordingly." (Emphasis added.)). Defendant made no such request in regards to these particular statements. Further, defendant's argument is logically unsound in that it would provide a windfall to defendants who fail to object at trial. Under defendant's position, out-of-court statements that are quite clearly offered at trial for reasons other than the truth of the matter would necessarily be declared inadmissible hearsay on appeal if the defendant had failed to object or request a limiting instruction. Such a result would be absurd.

¶ 60     Finally, it should be noted that the circuit court implicitly *did* deliver a limiting instruction. Early in the State's case, the defense objected to Sondra's testimony that C.J. had told her defendant was "messing with" her. The court then issued the following limiting instruction: "[A]ny claimed statement by [C.J.] at this point in time is not to be taken by you as the truth of the matter that that occurred for what she said. Rather, that statement is coming in for the limited purpose of showing what impact it had on this witness here." See *supra* ¶ 10. It is reasonable that defense counsel, going forward, did not object and seek a limiting instruction each and every time a person testified about what C.J. told them. It is also reasonable that the jury was capable of applying that limiting instruction to future testimony.

¶ 61     Because we find that the statements in question did not constitute hearsay, it follows that there was no clear or obvious error committed in the admission of those statements.

¶ 62                         B. Confrontation Clause

¶ 63     Defendant next contends that Minton's testimony regarding what J.M. told him as part of his 1998 investigation was testimonial in nature. He thus argues that because J.M. did not testify at trial, the admission of J.M.'s statement through Minton's testimony was a violation of his confrontation clause right. Separately, defendant also argues that Minton's testimony constituted hearsay. In response, the State argues that Minton's testimony regarding J.M.'s statements to him was not hearsay because it was not offered for the truth of the matter asserted. In reply, defendant disagrees with the State's characterization (see *supra* ¶ 57) and

also insists that the State's argument is unresponsive to his confrontation argument. In essence, defendant asserts that a violation of the confrontation clause turns only on whether J.M.'s statement was made out-of-court and was testimonial in nature, regardless of whether it was hearsay.

¶ 64        The confrontation clause of the sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. In application, the clause provides that "[t]estimonial statements of witnesses absent from trial" are barred unless the defendant has had prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004); see also *In re Rolandis G.*, 232 Ill. 2d 13, 24 (2008) ("[T]he [*Crawford*] Court held that testimonial out-of-court statements may be admitted as evidence at trial only if the declarant testifies or the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant.").

¶ 65        Some cases, such as *Rolandis G.* thus refer exclusively to "testimonial out-of-court statements" as the target of the confrontation clause. See also, *e.g.*, *People v. Ousley*, 235 Ill. 2d 299, 303 (2009). This is the language upon which defendant relies in his briefs. More cases, however, refer to "testimonial hearsay" as the type of evidence barred by the confrontation clause. *E.g.*, *Davis v. Washington*, 547 U.S. 813, 823 (2006). Other cases, meanwhile, used those or similar phrases seemingly interchangeably. *E.g.*, *Whorton v. Bockting*, 549 U.S. 406, 419 (2007); *Crawford*, 541 U.S. at 51, 53. Indeed, our own supreme court has on separate occasions used both phrases to describe the holding in *Crawford*. Compare *People v. Stechly*, 225 Ill. 2d 246, 250 (2007) ("[T]he United States Supreme Court decided [*Crawford*], which held that the *testimonial hearsay* statements of a witness who is absent from trial may not be admitted against a criminal defendant ***." (Emphasis added.)), with *Sutton*, 233 Ill. 2d at 110 ("In *Crawford*, the United States Supreme Court held that *testimonial out-of-court statements* may be admitted as evidence at trial only if the declarant testifies ***." (Emphasis added.)).

¶ 66        It is apparent that courts have used phrases like "testimonial out-of-court statements" and "testimonial hearsay" to have the same functional meaning. However, as this case demonstrates, the two formulations are far from identical. As discussed above, not every out-of-court statement (by a nontestifying declarant) is hearsay. See *supra* ¶¶ 53-56. For example, when an out-of-court statement is offered not for the truth of the statement, but for some other purpose, it is not hearsay. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Thus, to say the confrontation clause bars testimonial out-of-court statements is far broader than to say it bars testimonial hearsay.

¶ 67        Despite its conflicting language on the confrontation clause, the United State Supreme Court has addressed the present issue directly. In a parenthetical within a footnote to its opinion in *Crawford*, the Court wrote, "The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9. In 2010, our supreme court recognized the distinction drawn in the *Crawford* footnote and thus held: "[W]e need only consider whether a statement was testimonial if the statements at issue were, in fact, hearsay statements offered to prove the truth of the matter asserted." *People v. Williams*, 238 Ill. 2d 125, 142 (2010).

¶ 68        Minton's testimony regarding J.M.'s accusations against defendant was not hearsay. J.M.'s accusations were not offered for their truth but to illustrate why Minton got defendant and transported him to the police station. Further, J.M.'s statements served as the basis for

- 12 -

defendant's first admission to the offense, as after Minton relayed them to defendant, defendant agreed "it was basically true." Because J.M.'s statements to Minton were not offered to prove the truth of the matter asserted, there can be no confrontation clause violation stemming from their admission. *Id.*

¶ 69                    C. Prosecutorial Misconduct in Closing Argument

¶ 70    Defendant raises three contentions of error relating to the State's closing argument, characterizing each as an instance of prosecutorial misconduct. The three comments to which defendant takes exception are: (1) "You put your eyes in the eyes of a young child and imagine, as she told us, imagine what it was like to be subjected to the actions that she was subjected to," (2) "You saw [C.J.'s] mother. The evidence shows that she will not win mother of the year by any stretch of the imagination. But to [C.J.], that was her only mother and she didn't want to be taken away from her. And now, because of [defendant's] actions, she is away from her mother," and (3) "And I then asked her well, were you actually younger than that? She says well 12." Defendant argues that the first two comments were error in that they were solely intended to inflame the passions of the jury. He contends the final comment was a misstatement of the evidence.

¶ 71    It is well-settled that prosecutors are afforded wide latitude in making their closing arguments. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). However, "[c]losing argument must serve a purpose beyond inflaming the emotions of the jury." *Id.* at 128; see also *People v. Halteman*, 10 Ill. 2d 74, 84 (1956) ("[I]t is improper for the prosecutor to make statements the only effect of which is to inflame the passions or develop the prejudices of the jury without throwing any light upon the issues ***."). As the language of the prevailing cases make clear, the inflaming of the jury's passions is not directly barred; rather, any commentary that does so must also serve a different, proper purpose. *E.g.*, *People v. Blue*, 189 Ill. 2d 99, 128 (2000) ("[A]rgument that serves no purpose but to inflame the jury constitutes error."). It is, of course, error for a prosecutor to misstate the evidence. See *People v. Jackson*, 2012 IL App (1st) 102035, ¶¶ 16-17.

¶ 72    Both of the comments that defendant claims served only to inflame the passions of the jury also served purposes far more important to the State's case. Because C.J. herself was the only direct witness to defendant's conduct, the State had to rely on circumstantial evidence to corroborate her story. As part of that strategy, the State introduced evidence that both Sondra and Karen had noticed a marked difference in C.J.'s personality from the time she was a young child to the time she was a teenager, a period roughly correlating to defendant's crimes. In asking the jury to put themselves in C.J.'s shoes, the State was evoking the inference that being the victim of repeated sexual abuse would explain why C.J. transformed from being outgoing to withdrawn. Indeed, the State prefaced the comment selected here by defendant by saying "I submit [C.J.] was quite different when she was six, seven, eight years old."

¶ 73    Similarly, the State's reference to C.J.'s mother was plainly an attempt to bolster C.J.'s credibility. As defendant's conduct occurred over a period of approximately seven years, the State was tasked with providing a reason that C.J. had not come forward sooner. C.J.'s testimony showed that she did not wish to be separated from her mother. The State recognized that although the jury was unlikely to consider Colleen a particularly *good* mother, that would not negate C.J.'s desire to stay with her. Further, in stating that C.J. now was separated from Colleen "because of [defendant's] actions," the State was illustrating that C.J.'s concerns with

coming forward were not unfounded.[4] As each of the first two comments identified by defendant served a purpose other than to inflame the passions of the jury, we find that neither constituted error. See *Blue*, 189 Ill. 2d at 128.

¶ 74 Finally, to determine if the State did misstate the evidence with regard to C.J.'s testimony about her age, we must compare that testimony with the prosecutor's summary. During her direct examination, C.J. and the State engaged in the following exchange:

"[STATE]: About how old were you then?

[C.J.]: 13 maybe, and he—

[STATE]: Were you 13 or were you younger?

[C.J.]: I might have been younger."

Thus, C.J.'s testimony on direct examination regarding the conduct charged in count III was that she might have been younger than 13 years old.[5] In its rebuttal argument, the State accurately relayed that C.J. originally testified that she was 13 years old during that incident. The State continued, "And I then asked her well, were you actually younger than that? She says well 12."

¶ 75 The State recounted that C.J. testified she was 12 years old, when she actually testified that she "might have been younger" than 13 years old. To be sure, this misstatement of the evidence by the State was merely technical in nature. This is especially true considering the State needed only to prove C.J. was younger than 13 years old, as opposed to proving a specific age. See 720 ILCS 5/11-1.40(a)(1) (West 2014). Nevertheless, at this point in our analysis, we are not considering the potential impact of an error, only whether clear or obvious error occurred. Because the "clear or obvious" descriptor is a measure of an error's conspicuousness, rather than its magnitude, we conclude that such an error did occur when the prosecutor misstated C.J.'s testimony.

¶ 76                                    D. Jury Instruction Error

¶ 77 Finally, defendant argues that the circuit court committed error when it orally instructed the jury that predatory criminal sexual assault is committed when, *inter alia*, the victim is "13 years of age or under." See *supra* ¶ 37. The State does not contest that this instruction was error. Indeed, a victim must be younger than 13 years old to sustain a conviction for predatory criminal sexual assault of a child. 720 ILCS 5/11-1.40(a)(1) (West 2014). Accordingly, the circuit court committed a clear and obvious error.

---

[4]In passing, defendant also argues that the State misstated the evidence in that C.J. was not separated from Colleen "because of [defendant's] actions" but because of Colleen's decisions. This argument is reductive. The evidence showed that C.J. was removed from the house by DCFS immediately upon making her accusations against defendant. It is reasonable to infer that her continued absence from the house is related. Whether the continued separation is "because of" defendant's actions or Colleen's decisions is ultimately semantic, as the two are clearly intertwined.

[5]We note here that on cross-examination, C.J. testified that she was "11 or 12" years old when that incident occurred.

¶ 78                                              E. Prejudice

¶ 79        Defendant argues that the accumulation of errors at his trial rendered the trial fundamentally unfair. While defendant initially raised eight contentions of error as part of his arguments, we have concluded that only two of those eight instances actually constituted clear or obvious error for the purposes of our plain error analysis.

¶ 80        In reference to the first of these errors—the State's misstatement regarding C.J.'s age—we begin by noting that defendant does not argue that this type of error alone is a second-prong error, nor is this court aware of any cases suggesting that a misstatement of evidence in closing argument is a second-prong error. As to the cumulative error claim, we find that the State's "error" was so minor and technical in nature that any contribution the error made toward rendering defendant's trial unfair was *de minimis* at best.

¶ 81        As to the second error found by this court, defendant asserts that the provision of conflicting jury instructions "is a grave error that is not harmless and deprives the defendant of a fair trial." Of course, this argument parrots the second-prong standard. See *Sebby*, 2017 IL 119445, ¶ 50. Our analysis therefore turns on whether the provision of conflicting instructions in this case affected the fairness of the trial or undermined the judicial process, such that the error would be reversible under the second prong. *Id.*

¶ 82        Defendant relies primarily on *People v. Ayers*, 331 Ill. App. 3d 742, 750 (2002), in which the First District held, "Where conflicting instructions are given, one of which is a correct statement of the law and the other is an incorrect statement of the law, the error is not harmless and constitutes grave error." In support, the *Ayers* court cited to *People v. Haywood*, 82 Ill. 2d 540, 545 (1980), in which our supreme court wrote, "[T]he rule in Illinois is that when conflicting instructions are given, one of which is a correct statement of law and the other is an incorrect statement of law, the error is not harmless." *Ayers*, 331 Ill. App. 3d at 750 (citing *Haywood*, 82 Ill. 2d at 545). In turn, the *Haywood* court cited to its decision in *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977), in support of the same proposition. *Haywood*, 82 Ill. 2d at 545 (citing *Jenkins*, 69 Ill. 2d at 66). Importantly, each of these three cases involved conflicts present in the written pattern instructions presented to the jury.

¶ 83        In *People v. Alvine*, 173 Ill. 2d 273, 290 (1996), the supreme court made clear that the harm in conflicting jury instructions derives from the potential that such a conflict undermines the jury's function. The court wrote:

>            "While this court has previously held that jury instructions should be considered as a whole and not in isolation [citation], this proposition rests on the assumption that the jury instructions clearly and properly inform the jurors of the law. [Citations.] But when inconsistent instructions are presented to a jury, the jury's ability to perform its function is inhibited because the jury has not been adequately apprised of the law to be applied. [Citations.] When the instructions are confusing and create a situation in which the jurors believe they are forced to choose between conflicting elements within the instructions, as here, the instructions as a whole cannot be considered curative of the confusion." *Id.*

¶ 84        As the erroneous instruction in the present case was given orally, rather than in the written jury instructions, *Haywood* and *Jenkins* are not controlling. Moreover, when the jury instructions are considered as a whole, it is clear that there was absolutely no possibility that the jury was confused or would have felt compelled to choose between two different instructions. The circuit court's single misstatement was followed immediately by numerous

- 15 -

correct instructions as to the same element, both orally and in writing. The written instructions taken to the jury room were accurate. Further, the emphasis of *both* parties' closing arguments made clear that a conviction for predatory criminal sexual assault required the victim to be under 13 years of age at the time of the offense.

¶ 85    In sum, the circuit court's erroneous instruction in this case was made orally, only once, and immediately corrected numerous times. This stands in stark contrast to the uncorrected, contradictory written instructions that our supreme court had held to undermine the fairness of a trial. A single instance of a circuit court misspeaking, when that misstatement is immediately and repeatedly corrected, does not result in an unfair trial, and certainly does not challenge the integrity of the judicial process. Accordingly, defendant's cumulative plain error argument is rejected, and his convictions are affirmed.

¶ 86                                                    II. *Krankel*

¶ 87    Defendant next argues that if this court does not vacate his convictions pursuant to his cumulative error argument, it should instead remand so the circuit court may hold a preliminary *Krankel* inquiry. He maintains that his *pro se* filing in the circuit court, though styled as an appeal, nevertheless contained explicit assertions of ineffective assistance of counsel, thus mandating the preliminary *Krankel* inquiry.

¶ 88    When a defendant makes *pro se* posttrial claims of ineffective assistance of counsel, the circuit court must conduct an initial inquiry into those claims. *People v. Jolly*, 2014 IL 117142, ¶ 29 (citing *People v. Krankel*, 102 Ill. 2d 181 (1984)). If, after the inquiry, the court finds the claims lack merit, it may dismiss them; if the court finds possible neglect of the case, the court should appoint new counsel to fully pursue the ineffectiveness claims. Our supreme court has recently held that "an express claim of ineffective assistance of counsel is all that is necessary to trigger a *Krankel* inquiry." *People v. Ayres*, 2017 IL 120071, ¶ 21.

¶ 89    As a general matter, "[w]hen the notice of appeal is filed, the appellate court's jurisdiction attaches *instanter*, and the cause is beyond the jurisdiction of the trial court." *People v. Bounds*, 182 Ill. 2d 1, 3 (1998). Any ruling made by the circuit court in the absence of jurisdiction is void. *People v. Flowers*, 208 Ill. 2d 291, 306 (2003).

¶ 90    Illinois Supreme Court Rule 606(b) (eff. Dec. 11, 2014) holds that "[w]hen a timely posttrial or postsentencing motion directed against the judgment has been filed *** any notice of appeal filed before the entry of the order disposing of all pending postjudgment motions shall have no effect and shall be stricken by the trial court." The rule further provides that "[t]his rule applies whether the timely postjudgment motion was filed before or after the date on which the notice of appeal was filed." *Id.* Accordingly, when a timely posttrial or postsentencing motion directed against the judgment is filed, even after a notice of appeal is filed, the notice must be stricken. *E.g.*, *People v. Rowe*, 291 Ill. App. 3d 1018, 1020 (1997) ("[T]he timely filing of a postsentencing motion (*i.e.*, within 30 days of the judgment) acts as an implicit motion to dismiss the notice of appeal and renders the notice of appeal ineffectual."). Under section 116-1(b) of the Code, a defendant must bring a motion for a new trial within 30 days of the return of a verdict. 725 ILCS 5/116-1(b) (West 2014).

¶ 91    In *People v. Patrick*, 2011 IL 111666, our supreme court considered the intersection of the common law *Krankel* procedures and the procedural mandates set forth in the Code and supreme court rules. The court noted a clear distinction between the two, writing:

"[T]he State's attempt to graft the statutory requirement in section 116-1(b) onto a common law remedy is fundamentally flawed. A *pro se* posttrial motion alleging ineffective assistance of counsel is not a new trial motion as outlined in section 116-1. Rather, it is part of a separate common law procedure developed in a line of cases beginning with *Krankel*." *Id.* ¶ 30.

The court concluded that a defendant raising *pro se* ineffectiveness of counsel claims is exempt from the 30-day requirement of section 116-1(b). *Id.* ¶ 42.

¶ 92    While the *Patrick* court ruled that *Krankel* claims were exempt from certain procedural requirements, it emphasized that the jurisdictional rules relating to notices of appeal were still applicable, writing, "We note that once a notice of appeal has been filed, the trial court loses jurisdiction of the case and may not entertain a *Krankel* motion raising a *pro se* claim of ineffective assistance of counsel." *Id.* ¶ 39. Further, in carving out the *Krankel* exception to section 116-1(b), the court reiterated that the notice of appeal rules still apply: "[A]n exception to [the 30-day requirement] is if a defendant is seeking a new trial based on claims of ineffective assistance of counsel *and the claim is raised before a notice of appeal is filed*." (Emphasis added.) *Id.* ¶ 42.

¶ 93    In the present case, defendant did not raise his ineffectiveness claims before the notice of appeal was filed. In fact, he filed the two contemporaneously, apparently as a single filing. Once the notice of appeal was filed, the circuit court lost jurisdiction; had it conducted any sort of *Krankel* inquiry at that point, any resulting ruling would be void. *Flowers*, 208 Ill. 2d at 306.

¶ 94    We must next consider whether Rule 606(b) is applicable to defendant's *Krankel* claim. If that rule is applicable, and defendant's filing may be considered a timely posttrial motion, the effect of that filing would be the striking of the notice of appeal and return of jurisdiction to the circuit court so that it may rule upon defendant's claims.

¶ 95    We find that in the present case, Rule 606(b) does not act to undermine the notice of appeal and return jurisdiction to the circuit court. We base this holding primarily on the court's decision in *Patrick*, which calls into doubt whether that rule has any import on a *Krankel* claim. First, *Patrick* stands generally for the proposition that statutory procedural rules should not be grafted onto the common law *Krankel* remedy. *Patrick*, 2011 IL 111666, ¶ 30. More importantly the *Patrick* court explicitly stated that when a notice of appeal is filed, "the trial court loses jurisdiction of the case and may not entertain a *Krankel* motion." *Id.* ¶ 39. The court made no reference to Rule 606(b) or any potential that a *Krankel* motion might render the notice of appeal ineffectual such that the circuit court retained jurisdiction.[6]

¶ 96    Finally, the *Patrick* court's repeated references to the notice of appeal, when the notice of appeal was not at issue in that case, were far more than mere *dicta*. The court recognized that in divorcing *Krankel* claims from the requirements of section 116-1(b) of the Code, it was removing those claims from the auspices of the primary posttrial timeliness rule in criminal procedure. So as to make clear that *Krankel* claims were still bound by *some* timeliness requirements, the court repeatedly invoked the filing of the notice of appeal as, essentially, the

---

[6]Our conclusion here only applies to those situations where a defendant makes his *Krankel* claims contemporaneously with the filing of the notice of appeal, or, by logical extension, where a defendant makes those claims *after* the notice of appeal has been filed. We express no opinion on the procedure to be followed where a defendant raises *pro se* claims of ineffective assistance of counsel clearly prior to the filing of the notice of appeal.

final deadline to make such claims. To hold that *Krankel* claims should still be ruled upon after the notice of appeal has been filed is not only contrary to the spirit and letter of *Patrick*, but it would essentially leave no rule governing the timeliness of such claims.

¶ 97 Defendant points out that the defendant in *Ayres*, our supreme court's most recent contribution to *Krankel* jurisprudence, also filed his *pro se* claims of ineffectiveness contemporaneously with his *pro se* notice of appeal. In that case, the supreme court held that the circuit court had erred by failing to conduct a preliminary *Krankel* inquiry. *Ayres*, 2017 IL 120071, ¶¶ 6, 24. Though the issue of the notice of appeal was not addressed by the supreme court, defendant would argue that the court's grant of relief to *Ayres* implies a finding that the circuit court would have jurisdiction to conduct a *Krankel* inquiry.

¶ 98 Defendant's argument ignores a key factual distinction between *Ayres* and the present case. In *Ayres*, the defendant's attorney filed a timely postsentencing motion on September 26, 2013. *Id.* ¶ 6. In turn, the defendant's *pro se* notice of appeal and contentions of ineffective assistance of counsel were filed on September 30, 2013. *People v. Ayres*, 2015 IL App (4th) 130996-U, ¶ 6. Thus, it was not the defendant's *Krankel* claim that negated his notice of appeal and allowed the circuit court to retain jurisdiction by operation of Rule 606(b), but counsel's earlier timely filed postsentencing motion. That motion clearly triggered Rule 606(b), such that the circuit court in that case still had jurisdiction to entertain the defendant's *Krankel* claim, even after he filed his notice of appeal.

¶ 99 The same is not true in this case. When defendant filed his notice of appeal, even contemporaneously with his ineffectiveness claims, he had perfected his appeal and deprived the circuit court of jurisdiction. Accordingly, the circuit court did not err in failing to conduct a preliminary *Krankel* inquiry, as it was without jurisdiction to do so. Of course, the court's failure to address defendant's ineffectiveness claims would not prevent him from raising those same claims on appeal. However, defendant has not done so.

¶ 100                                III. Public Defender Fee

¶ 101 Finally, defendant contends that the circuit court erred in imposing the public defender fee without first conducting a hearing on defendant's financial circumstances and ability to pay. The State concedes that such a hearing is a prerequisite to the imposition of the public defender fee and concedes that the hearing was not held in this case. The parties do, however, dispute the proper remedy.

¶ 102 Payment for court-appointed counsel is governed by section 113-3.1(a) of the Code. 725 ILCS 5/113-3.1(a) (West 2014). That section expressly provides for a hearing in which the court shall consider defendant's financial circumstances in determining the amount to be paid. *Id.* Our supreme court has held that the hearing is mandatory. *People v. Gutierrez*, 2012 IL 111590, ¶ 26 ("Pursuant to statute, a public defender fee may be imposed only by the circuit court after notice and a hearing on the defendant's ability to pay. We again remind the trial courts of their duty to hold such a hearing before imposing these fees, and we trust that we will not have to speak on this issue again."). We accept the State's concession that the public defender fee must be vacated and remand the matter with directions that the circuit court enter an order vacating the fee along with an updated costs sheet.

¶ 103 Defendant contends that *vacatur* of the fee should be the end of the matter. The State, however, argues that the circuit court should, on remand, hold the hearing on defendant's ability to pay. The parties agree that the issue of remand turns on whether the circuit court can

be described as having held "some sort of a hearing" on the matter. *People v. Somers*, 2013 IL 114054, ¶ 15.

¶ 104 We agree with defendant and find that there was not "some sort of hearing" on the issue. In *People v. Moore*, 2015 IL App (1st) 141451, ¶ 39, the First District reached the same conclusion on remarkably similar facts, writing:

"Although insufficient to satisfy section 113-3.1(a) requirements, the trial court in *Somers* did have 'some sort of hearing' when it delved into the area of defendant's financial circumstances by asking about his employment and his ability to work. In *** this case, there were no questions whatsoever posed to defendant regarding his financial status, his employment, his ability to work, or his ability to pay. The trial court did not address defendant at all. In addition, there is no indication that in imposing the fee, the trial court consulted the presentence investigation report or any affidavit that defendant may have filled out regarding his assets after requesting the services of the public defender. In short, there was no 'sort of hearing.' "

We adopt the reasoning of the *Moore* court completely. On remand, the circuit court should vacate the public defender fee previously imposed and may not conduct a hearing on the matter or reimpose the fee.

¶ 105                                         CONCLUSION
¶ 106 The judgment of the circuit court of Tazewell County is affirmed in part, vacated in part, and remanded with directions.

¶ 107 Affirmed in part and vacated in part.
¶ 108 Remanded with directions.